# NO. 22-2290, 23-1183

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

## CISCO SYSTEMS, INC., HEWLETT PACKARD ENTERPRISE CO.,
**Appellants**

**v.**

## K.MIZRA LLC,
**Appellee**

## OPENING BRIEF OF APPELLANT CISCO SYSTEMS, INC.

**Appeals from the United States Patent and Trademark Office, Patent Trial and Appeal Board in Nos. IPR2021-00593, IPR2022-00081, IPR2022-00084.**

### HAYNES AND BOONE, LLP

Theodore M. Foster
David L. McCombs
Debra J. McComas
2323 Victory Avenue
Suite 700
Dallas, Texas 75219
Phone: (972) 739-8649
Fax: (214) 651-5940

Eugene Goryunov
600 Congress Avenue
Suite 2215
Chicago, Illinois 60601
Phone: (312) 216-1630
Fax: (312) 216-1621

Angela M. Oliver
800 17th Street NW
Suite 500
Washington, D.C. 20006
Phone: (202) 654-4552
Fax: (202) 654-4252

**ATTORNEYS FOR APPELLANT CISCO SYSTEMS, INC.**

# RELEVANT CLAIMS OF U.S. PATENT NO. 8,234,705 (Appx77)

1. A method for protecting a network, comprising:

detecting an insecure condition on a first host that has connected or is attempting to connect to a protected network, wherein detecting the insecure condition includes contacting a trusted computing base associated with a trusted platform module within the first host, receiving a response, and determining whether the response includes a valid digitally signed attestation of cleanliness, wherein the valid digitally signed attestation of cleanliness includes at least one of an attestation that the trusted computing base has ascertained that the first host is not infested, and an attestation that the trusted computing base has ascertained the presence of a patch or a patch level associated with a software component on the first host;

when it is determined that the response does not include a valid digitally signed attestation of cleanliness, quarantining the first host, including by preventing the first host from sending data to one or more other hosts associated with the protected network, wherein preventing the first host from sending data to one or more other hosts associated with the protected network includes receiving a service request sent by the first host, serving a quarantine notification page to the first host when the service request comprises a web server request, and in the event the service request comprises a DNS query, providing in response an IP address of a quarantine server configured to serve the quarantine notification page if a host name that is the subject of the DNS query is not associated with a remediation host configured to provide data usable to remedy the insecure condition; and permitting the first host to communicate with the remediation host.

# CERTIFICATE OF INTEREST

| | |
|---|---|
| **Case Number** | 22-2290, 23-1183 |
| **Short Case Caption** | Cisco Systems, Inc., Hewlett Packard Enterprise Co. v. K.Mizra LLC |
| **Filing Party/Entity** | Cisco Systems, Inc. |

> **Instructions:** Complete each section of the form. In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance. **Please enter only one item per box; attach additional pages as needed and check the relevant box.** Counsel must immediately file an amended Certificate of Interest if information changes. Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: March 6, 2023          Signature: */s/ Theodore M. Foster*

Name: Theodore M. Foster

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. |
| ___ None/Not Applicable | X None/Not Applicable | X None/Not Applicable |
| Cisco Systems, Inc. | | |
| | | |

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

___ None/Not Applicable                              ___ Additional pages attached

| | | |
|---|---|---|
| Gregory Huh<br>(Haynes and Boone, LLP) | | |
| | | |
| | | |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

___ None/Not Applicable                              ___ Additional pages attached

| | | |
|---|---|---|
| K.Mizra LLC v. Cisco Systems, Inc., No. 6:20-cv-01031 (W.D. Tex.) | K.Mizra LLC v. Forescout Technologies Inc., No. 2:21-cv-248-JRG (E.D. Tex.) | K.Mizra LLC v. Fortinet, Inc., No. 2:21-cv-249-JRG (E.D. Tex.) |
| K.Mizra LLC v. Hewlett Packard Enterprise Co., No. 2:21-cv-305-JRG (E.D. Tex.) | Forescout Technologies, Inc. v. K.Mizra LLC, IPR2022-00081 (P.T.A.B.) | |
| | | |

**6. Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

_X_ None/Not Applicable                              ___ Additional pages attached

| | | |
|---|---|---|
| | | |

# TABLE OF CONTENTS

RELEVANT CLAIMS OF U.S. PATENT NO. 8,234,705 (Appx77) ..................... i

CERTIFICATE OF INTEREST ................................................................ ii

TABLE OF CONTENTS ........................................................................ iv

TABLE OF AUTHORITIES ................................................................... vii

STATEMENT OF RELATED CASES ........................................................1

JURISDICTIONAL STATEMENT ............................................................2

STATEMENT OF THE ISSUES ...............................................................3

INTRODUCTION..................................................................................4

STATEMENT OF THE CASE...................................................................6

    A.    Technical Background...........................................................6

        1.    The '705 Patent .........................................................7

        2.    The Prior Art...........................................................13

            a.    Gleichauf.........................................................14

            b.    Lewis...............................................................20

            a.    Ovadia .............................................................21

    B.    Procedural History ............................................................22

        1.    Cisco's IPR Petition.................................................22

            a.    Cisco's Obviousness Challenge.......................22

            b.    Cisco's Five Obviousness Rationales for Combining Gleichauf and Lewis.....................23

        2.    The Board's Institution Decision .............................26

        3.    Post-Institution Proceedings....................................27

4.     The Final Written Decision .......................................................30

SUMMARY OF THE ARGUMENT ...................................................33

ARGUMENT .......................................................................................35

I.     Standard of Review .......................................................................35

II.    The Board misapplied the law of obviousness by categorically
       requiring a motivation to achieve a specific benefit, even when a
       proposed combination presents a predictable variation on the
       prior art that substitutes one known element for another with
       similar functionality. ....................................................................37

       A.     The Board's focus on the benefits to be obtained by a
              combination caused the Board to overlook and fail to
              address Cisco's first two obviousness rationales. ..............39

       B.     The Board erred as a matter of law by concluding that the
              existence of certain functionality in a reference would
              preclude obviousness where another reference would
              achieve that functionality in another way...........................42

III.   Regarding Cisco's fourth obviousness rationale, the Board's
       finding that Gleichauf describes notification messages displayed
       in a browser using XML pages lacks any evidentiary support......46

IV.    The Board committed multiple procedural errors that prejudiced
       Cisco and, at a minimum, require vacatur and remand.................52

       A.     As to Cisco's fourth obviousness rationale, the Board
              violated the Administrative Procedure Act, due process,
              and the doctrine of party presentation by creating its own
              arguments to reject that rationale........................................52

       B.     In finding a lack of motivation to combine based on
              benefits already allegedly present in Gleichauf, the Board
              violated its own rules, the Administrative Procedure Act,
              and due process because K.Mizra did not raise that
              argument until its Sur-Reply. .............................................57

CONCLUSION ................................................................................... 60

CERTIFICATE OF COMPLIANCE .................................................. 62

ADDENDUM ..................................................................................... 63

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*In re Anova Hearing Labs, Inc.*,
   809 F. App'x 840 (Fed. Cir. 2020) (non-precedential) .............................. 42, 43

*Dell Inc. v. Acceleron, LLC*,
   818 F.3d 1293 (Fed. Cir. 2016) ......................................................... 55

*E.I. du Pont De Nemours & Co. v. MacDermid Printing Sols., L.L.C.*,
   657 F. App'x 1004 (Fed. Cir. 2016) (non-precedential) ................................... 44

*ESIP Series 2, LLC v. Puzhen Life USA, LLC*,
   958 F.3d 1378 (Fed. Cir. 2020) ......................................................... 36

*Finjan, Inc. v. Cisco Systems, Inc.*,
   837 F. App'x 799 (Fed. Cir. 2020) (non-precedential) ..................................... 59

*In re Gartside*,
   203 F.3d 1305 (Fed. Cir. 2000) ......................................................... 36

*Gemtron Corp. v. Saint-Gobain Corp.*,
   572 F. 3d 1371 (Fed. Cir. 2009) ........................................................ 50

*Graham v. John Deere Co. of Kansas City*,
   383 U.S. 1 (1966) ...................................................................... 36

*Henny Penny Corp. v. Frymaster LLC*,
   938 F.3d 1324 (Fed. Cir. 2019) ......................................................... 37

*Intel Corp. v. Qualcomm Inc.*,
   21 F.4th 784 (Fed. Cir. 2021) ......................................... 44, 45, 46, 51

*Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*,
   821 F.3d 1359 (Fed. Cir. 2016) ......................................................... 37

*In re IPR Licensing, Inc.*,
   942 F.3d 1363 (Fed. Cir. 2019) ......................................................... 37, 55

*Iron Oak Technologies, LLC v. Samsung Electronics Co.*,
    839 F. App'x 547 (Fed. Cir. 2021) (non-precedential) ......................................59

*Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*,
    688 F.3d 1342 (Fed. Cir. 2012).................................................................43

*KSR International Co. v. Teleflex Inc.*,
    550 U.S. 398 (2007) .....................................................................*passim*

*Nike, Inc. v. Adidas AG*,
    955 F.3d 45 (Fed. Cir. 2020) ................................................................56

*P Tech, LLC v. Intuitive Surgical, Inc.*,
    No. 2022-1102, 2022 WL 17688149 (Fed. Cir. Dec. 15, 2022) (non-
    precedential)....................................................................................59

*Panduit Corp. v. Dennison Mfg. Co.*,
    810 F.2d 1561 (Fed. Cir. 1987) .............................................................36

*Provisur Techs., Inc. v. Weber, Inc.*,
    50 F.4th 117 (Fed. Cir. 2022) ...............................................................41

*Rovalma, S.A. v. Bohler-Edelstahl GmbH & Co. KG*,
    856 F.3d 1019 (Fed. Cir. 2017) .............................................................55

*SAS Inst., Inc. v. ComplementSoft, LLC*,
    825 F.3d 1341 (Fed. Cir. 2016), *rev'd and remanded on other grounds
    sub nom. SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348 (2018)............................. 55, 60

*Shinn Fu Co. of Am., Inc. v. Tire Hanger Corp.*,
    701 F. App'x 942 (Fed. Cir. 2017) (non-precedential) ................................41

*Uber Techs., Inc. v. X One, Inc.*,
    957 F.3d 1334 (Fed. Cir. 2020).............................................................40

*United States v. Sineneng-Smith*,
    140 S. Ct. 1575 (2020) ..........................................................47, 55, 56

*VLSI Tech. LLC v. Intel Corp.*,
    53 F.4th 646 (Fed. Cir. 2022).............................................................55

## Statutes

5 U.S.C. § 554 ............................................................................55, 57

5 U.S.C. § 556 ................................................................................ 55

## Other Authorities

37 C.F.R. § 42.23 ....................................................................... 37, 58

Joshua L. Sohn, *Re-Thinking the "Motivation-to-Combine" in Patent Law*, 48 AIPLA Q.J. 1 (2020) .......................................................... 36

## STATEMENT OF RELATED CASES

In accordance with Federal Circuit Rule 47.5, no other appeal in or from the same civil action or proceeding was previously before this or any other appellate court.

The patent at issue in this appeal is being asserted against Appellant Cisco Systems, Inc. in *K.Mizra LLC v. Cisco Systems, Inc.*, 6:20-cv-01031 (W.D. Tex.). That litigation was stayed pending the final written decisions in IPR2021-00593 (this case) and IPR2021-00594, and on January 24, 2023, the district court lifted the stay and issued an amended scheduling order setting the case for jury trial beginning August 14, 2023.

The patent is also being asserted in the following litigations:

- *K.Mizra LLC v. Forescout Technologies Inc.*, No. 2:21-cv-248-JRG (E.D. Tex.)

- *K.Mizra LLC v. Fortinet, Inc.*, No. 2:21-cv-249-JRG (E.D. Tex.)

- *K.Mizra LLC v. Hewlett Packard Enterprise Co.*, No. 2:21-cv-305-JRG (E.D. Tex.)

# JURISDICTIONAL STATEMENT

Cisco Systems, Inc. ("Cisco") filed a Petition for *Inter Partes* Review of U.S. Patent No. 8,234,705 on March 15, 2021. Appx82. The Patent Trial and Appeal Board had jurisdiction pursuant to 35 U.S.C. §§ 6(b), 314(a), 316(c), 318(a).

Hewlett Packard Enterprise Co. ("HPE") filed a Petition for *Inter Partes* Review of U.S. Patent No. 8,234,705 and a Motion for Joinder to the Cisco-initiated IPR on October 22, 2021. Appx2646, Appx2726, Appx2732, Appx2740. The Patent Trial and Appeal Board had jurisdiction pursuant to 35 U.S.C. §§ 6(b), 314(a), 316(c), 318(a). The Board joined HPE as a petitioner in the Cisco-initiated IPR on May 9, 2022.

The Board issued its Final Written Decision on September 19, 2022. Appx83. Cisco timely filed a notice of appeal on September 27, 2022. Appx79. HPE timely filed a notice of appeal on November 23, 2022. Appx2600. The Cisco and HPE appeals were consolidated by this Court on December 9, 2022.

This Court has jurisdiction pursuant to 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. § 141(c).

# STATEMENT OF THE ISSUES

1. Whether the Board erred as a matter of law by failing to follow *KSR*'s direction that a patent claim that merely substitutes a familiar element according to known methods, to yield predictable results, would have been obvious.

2. Regarding Cisco's fourth rationale for combining Gleichauf and Lewis, whether substantial evidence supports the Board's finding that Gleichauf discloses providing notification messages through web browsers.

3. Whether the Board's analysis of Cisco's fourth rationale for combining Gleichauf and Lewis violated the Administrative Procedure Act, due process, and principles of party presentation by relying on reasoning and evidence that neither party raised—and without giving the parties notice of and an opportunity to respond to that evidence.

4. Whether the Board violated the Administrative Procedure Act and due process by considering whether the benefits of the combination identified by Cisco could have been achieved by Gleichauf alone, where Patent Owner raised that argument for the first time in its Sur-reply.

**INTRODUCTION**

U.S. Patent No. 8,234,705 ("the '705 patent") describes a system and method for network security that differs in only minor ways from an earlier Cisco patent (Gleichauf). The minor tweaks necessary to render the claims of the '705 patent obvious were readily found in other prior art references, including Lewis. Cisco presented five independent reasons as to why a person of ordinary skill in the art would have found it obvious to modify Gleichauf in light of Lewis. But, in rejecting Cisco's motivation arguments, the Board misapplied the law of obviousness, relied on findings that lack any evidentiary support, and committed procedural errors that substantially prejudiced Cisco. The Board's decision should be reversed, vacated, and remanded for the Board to conduct a proper obviousness analysis.

At the most fundamental level, the Board misapplied the law of obviousness by ignoring the "expansive and flexible approach" required under *KSR International Co. v. Teleflex Inc.*, 550 U.S. 398 (2007), and instead employing a rigid standard that would require a combination to achieve a specific benefit. Under *KSR*, this case presents a textbook case of obviousness: as relevant to this appeal, the difference between the '705 patent and Cisco's earlier network security patent (Gleichauf) is that Gleichauf discloses providing a notification message to a user that the user's device has been quarantined, while the '705 patent directs the user to a *web page* with

that same information. Another prior art reference (Lewis) discloses informing a user that the user's device has been quarantined by directing the user to a web page. The claimed method thus merely rearranges familiar, known elements with predictable results. 550 U.S. at 416. The Board, however, rejected that conclusion because it believed Cisco had not shown a specific benefit that would have motivated one of skill in the art to modify Gleichauf. In fact, there were benefits, as explained below; but regardless, the Board erred as a matter of law in imposing that rigid requirement and not recognizing that the close similarity of the prior art and only modest rearranging of known elements of a network security system would have rendered the claims obvious.

Further compounding the problems with the Board's analysis, a critical part of the Board's reasoning lacks any evidentiary support. The Board rejected one of Cisco's proposed rationales by finding that Gleichauf's notification messages "may be displayed on a browser using XML pages." Appx32. But Gleichauf discloses nothing of the sort, and no evidence supports that finding. That portion of the Board's analysis lacks substantial evidence support, is contrary to an admission regarding obviousness by K.Mizra, and cannot be sustained.

Finally, the Board violated various procedural norms, including by rejecting one of Cisco's proposed motivation rationales using arguments that K.Mizra raised

for the first time in its Sur-Reply and, worse, rejecting another of Cisco's motivation rationales based on a theory of the evidence that no party argued. Cisco did not have an opportunity to address any of those arguments through briefing or responsive evidence, thus violating Cisco's procedural rights guaranteed by both the Administrative Procedure Act and due process.

The Board's multiple errors in its reasons-to-combine analysis warrant reversal and vacatur of the Board's Decision, so that the Board, on remand, may consider the remainder of Cisco's obviousness contentions under the proper legal and procedural framework.

## STATEMENT OF THE CASE

This appeal arises from a Final Written Decision ("Decision") by the U.S. Patent Trial and Appeal Board ("Board") in an *inter partes* review of U.S. Patent No. 8,234,705. In its Decision, the Board determined that Cisco had not demonstrated obviousness as to claims 1–3, 5–13, 15–19 of the '705 patent ("the challenged claims") based solely on a purported lack of a reason to combine two of the references in Cisco's proposed combination.

### A.    Technical Background

The technology at issue in this case involves network security. Specifically, the '705 patent describes a system and method for ensuring that a host (e.g., a

computer) that is trying to connect to a protected network does not spread harmful viruses throughout the protected network.

### 1. The '705 Patent

The '705 patent recognized that "[l]aptop and wireless computers and other mobile systems pose a threat to elements comprising and/or connected to a network service provider, enterprise, or other protected networks to which they reconnect after a period of connection to one or more networks and/or systems that are not part of the service provider, enterprise, or other protected network." Appx68, 1:14–31. For example, by connecting to the Internet "through public, wireless, and/or otherwise less secure access nodes, such mobile systems may become infected by computer viruses, worms," etc. Appx68, 1:14–31. The '705 patent recognized that "[u]pon connecting to a protected network, a system may infect or otherwise harm resources associated with the protected network before measures can be taken to detect and prevent the spread of such infections or harm." Appx68, 1:34–38. Accordingly, the '705 patent sought to find "a reliable way to ensure that a system does not infect or otherwise harm other network resources when connected to a protected network." Appx68, 1:38–41.

The '705 patent purported to solve that problem by determining whether a computer should be quarantined when it attempts to connect to a protected network.

Appx42, Abstract. If quarantined, the computer is given only limited access to the protected network. Appx42, Abstract. For example, in some embodiments, a quarantined computer is permitted to access the protected network only to the extent needed to remedy a condition that caused the quarantine to be necessary, "such as to download a software patch, update, or definition; install, remove, and/or configure software and/or settings as required by a policy; and/or to have a scan or other diagnostic and/or remedial operation performed." Appx42, Abstract. Accordingly, a quarantined computer is permitted access to a remediation server. Appx73, 12:3–7.

Figure 10B of the '705 patent, below, generally illustrates an environment in which infected computers are quarantined.



FIG. 10B

Appx57, Fig. 10B; *see also* Appx68, 2:14–16. Gateway 1028 comprises a gateway, router, firewall, or other device that controls access between a protected network and the Internet and/or another public or private network. Appx73, 11:63–67. If one of the computers 1020–1024 attempts to connect to the protected network and is quarantined, it is permitted to access remediation server 1032 to download a patch, etc. Appx73, 12:1–7. But any attempts to access something other than remediation server 1032 are redirected to quarantine server 1034, which provides a notice and/or other information to the user of the quarantined computer. Appx73, 12:8–11.

Figure 13 of the '705 patent, below, illustrates a method for monitoring computers for infestation:



Appx60, Fig. 13; *see also* Appx68, 2:21–23. At step 1302, a computer is queried for a cleanliness assertion, e.g., by contacting a trusted computing base within the computer and requesting an authenticated infestation scan by trusted software. Appx74, 13:64–14:1. The '705 patent gives examples of trusted computing bases, including a "Paladium security initiative under development by Microsoft." Appx74, 14:2–7. The query for cleanliness may, for example, be responded to by antivirus software, with assertions about the currency of a scan (e.g., when a scan

was last performed). Appx74, 14:12–16. If the computer asserts it is clean in step 1303, monitoring is complete (step 1305). Appx74, 14:22–24. But, if a cleanliness assertion is not provided at step 1303, the computer is presumed to be vulnerable (step 1304) and is placed in quarantine. Appx74, 14:24–25, Appx14:28–35.

As noted, a quarantined computer "is provided only limited access to the protected network." Appx69, 3:11–13. It is permitted to access a remediation server (to fix the vulnerability), but other access requests are redirected to a quarantine server. Appx73, 12:3–9; *see also* Appx69, 3:13–23. If a request from the computer is a web server request (e.g., an HTTP request), the server responds with a quarantine notification page. Appx75, 15:66–16:2. That notification web page provides information that the computer is quarantined and/or provides links to appropriate remediation options, such as a link to a site that provides software for removing a virus that the computer is believed to contain. Appx75, 16:2–9. If the request from the computer is a DNS inquiry, the inquiry is tested to determine whether it is requesting a remediation host name (e.g., the host name for the IP address of the remediation server). Appx75, 16:16–23. If so, the request is permitted, e.g., by providing the actual IP address of the remediation server. Appx75, 16:23–28. If not,

an IP address for a quarantine server is provided as a redirected IP address. Appx75, 16:28–31.

Claim 1 of the '705 patent is representative and recites:

1. A method for protecting a network, comprising:

   **[1.1]** detecting an insecure condition on a first host that has connected or is attempting to connect to a protected network, wherein detecting the insecure condition includes **[1.2]** contacting a trusted computing base associated with a trusted platform module within the first host, **[1.3]** receiving a response, and **[1.4]** determining whether the response includes a valid digitally signed attestation of cleanliness, **[1.5]** wherein the valid digitally signed attestation of cleanliness includes at least one of an attestation that the trusted computing base has ascertained that the first host is not infested, and an attestation that the trusted computing base has ascertained the presence of a patch or a patch level associated with a software component on the first host;

   **[1.6]** when it is determined that the response does not include a valid digitally signed attestation of cleanliness, quarantining the first host, including by preventing the first host from sending data to one or more other hosts associated with the protected network, wherein preventing the first host from sending data to one or more other hosts associated with the protected network includes **[1.7]** receiving a service request sent by the first host, **[1.8]** serving a quarantine notification page to the first host when the service request comprises a web server request, **[1.9]** and in the event the service request comprises a DNS query, providing in response an IP address of a quarantine server configured to serve the quarantine notification page if a host name that is the subject of the DNS query is not associated with a remediation host

configured to provide data usable to remedy the insecure condition; and

**[1.10]** permitting the first host to communicate with the remediation host.

Appx77.[1]

The Board adopted Cisco's definition of the level of skill in the art, i.e., that a POSITA would have had a bachelor's degree in computer science, computer engineering, electrical engineering, or an equivalent training, and approximately two years of professional experience in the field of network communications, and more specifically, network security (where lack of professional experience could be remedied by additional education, and vice versa). Appx12–13.

## 2. The Prior Art

Cisco's Petition presented a simple combination of three references: Gleichauf,[2] Ovadia,[3] and Lewis.[4]

In its proposed combination, Cisco relied on Gleichauf to teach almost all of the limitations of the challenged independent claims, except for: (1) the limitations

---

[1] Bracketed numbers have been added to the claim to reflect how the parties and Board referred to the claim limitations—and how those limitations are referred to in this brief.

[2] U.S. Patent No. 9,436,820 to Gleichauf et al.

[3] U.S. Patent No. 7,747,862 to Ovadia.

[4] U.S. Patent No. 7,533,407 to Lewis et al.

reciting "trusted platform module" (none of which are at issue in this appeal), for which Cisco also relied on Ovadia; and (2) the limitations relating to the "quarantine notification page" (limitations 1.8 and 1.9), for which Cisco also relied on Lewis. *See* Appx161–186 (Petition); *see also* Appx22.

### a. Gleichauf

Gleichauf is a U.S. patent filed by Cisco in August 2004. Appx1146. Gleichauf relates generally to network security and, more specifically, to controlling a computer's access to network resources based on the computer's security posture. Appx1155, 3:4–9, Appx1157, 7:55–61. Gleichauf describes a method highly similar to the '705 patent, differing in just two respects: the '705 patent's claims further require (1) a trusted platform module; and (2) redirecting a user to a web page that notifies the user it is quarantined (rather than delivering another type of message with that same information, as in Gleichauf).

Gleichauf recognized that a computer device may "receive malware, such as computer viruses, worms, spy-ware, spam, or other types of unauthorized applications or content" while connected to a network such as the Internet. Appx1154, 1:6–14. Gleichauf noted that such infections commonly result from "a public network connection." Appx1154, 1:28–38.

Just like the '705 patent, Gleichauf identified a threat to corporate networks when a computer connects to a corporate network after having been infected with malware while connected to a public network. Appx1154, 1:28–41, 2:3–8. Specifically, Gleichauf noted that "[w]hen the laptop reattaches to the corporate LAN, the malware can then infiltrate the corporate network and impair the operation of that network and its associated resources." Appx1154, 1:39–41. This was the same problem identified by the '705 patent. *See* Appx68, 1:14–31 ("Laptop and wireless computers and other mobile systems pose a threat to elements comprising and/or connected to a . . . protected network[] to which they reconnect after a period of connection to one or more networks and/or systems that are not part of the . . . protected network.").

Also like the '705 patent, Gleichauf sought to mitigate that problem by "controlling access to a network depending on the configuration state or 'security posture' of a device when it attempts to connect to that network." Appx1155, 3:4–9; *see also* Appx1155, 4:32–40. A device's "security posture" reflects its ability to resist reception or transmission of malware (e.g., viruses), content (spam and/or data theft), or access by unauthorized users. Appx1157, 8:52–56. To assess a device's posture, Gleichauf describes a sequence of "challenge requests" that occur when a device attempts to access the protected network. *See* Appx1155, 3:9–21. The

challenge request sequence causes the "posture agent within the computerized device to collect information associated with the security posture of the computer device," also called the device's "posture credentials." Appx1155, 3:28–36. The posture credentials "can identify critical security information," including what virus software and definitions are installed on the computer, when a local antivirus scan was last executed, etc. Appx1155, 3:36–45, Appx1163, 19:61–67. Those posture credentials are then transmitted "to a policy server operating within the network" to determine the allowable level of access to be given to the device attempting to connect to the network. Appx1155, 3:33–36; *see also* Appx1155, 4:7–10.

"Based upon an analysis of the posture credentials returned by the computerized device, the policy server determines what type of admission policy and level of network access and privileges should be extended to the computer device." Appx1155, 4:15–19. For example, "[d]evices that are compliant with network admission policy would typically be given full network access." Appx1155, 4:19–21. But "[d]evices that are more significantly out of compliance may be placed on an isolated, or 'quarantine' network segment where they can be brought into compliance," and "[d]evices that violate core admission requirement[s] may be denied network access entirely." Appx1155, 4:24–28.

This process is illustrated by Gleichauf's Figure 1, reproduced below, which depicts a computerized device 22 attempting to access network resources 25 on the network 24:



Appx1147, Fig. 1 (annotated with colors for purposes of this appeal); *see also* Appx1157, 8:38–40.

Gleichauf's policy server 28 controls the computerized device's access to the network. Appx1157–1158, 7:4–8, 10:20–23, 10:30–37; *see also* Appx17. The policy server conducts a "real-time analysis of the posture credentials of the computerized device, determines a security state of the computerized device and either provides

some level or denies the computerized device access to the network resources based upon the analysis of posture." Appx1146, Abstract. For example, the policy server may "allow[] access to restricted resources, quarantine[e] the computer device or deny[] access completely." Appx1157, 7:4–8. This "limit[s] vulnerable computerized devices from accessing the network resources and minimiz[es] the risk that the network resources receive or transmit malware." Appx1146, Abstract; *see also* Appx1159, 12:7–13.

When the policy server detects a security issue with a device, e.g., a device that is significantly out compliance, the device is quarantined. Appx1155, 4:24–27, 4:50-52. While in quarantine, the device has limited network access but is permitted to access a "remediation server" that resides on the quarantine network. Appx1156, 5:4–8. The remediation server provides security updates suitable to bring the device into compliance with network access security protocols. Appx1155–1156, 4:50–52, 5:8–11, Appx1161, 16:13–21, Appx1163, 20:29–37.

Gleichauf also explains that the computerized device 22 may "receive[] a redirection access instruction 64" that "redirect[s] traffic from the computerized device 22 to a remediation server 66." Appx1163, 20:17–21, Appx1150, Fig. 5 (step 154). For instance, the data communications device 26 "redirects HTTP

requests from the user device 22 to the remediation server 66." Appx1163, 20:21–26.

Further, Gleichauf describes the computerized device receiving a "posture notification message" from the policy server. Appx1163, 20:48–64, Appx1150, Fig. 5 (step 156). The notification "may indicate the result of the posture validation check," such as a message "indicating that the device has been quarantined and needs to be remediated." Appx1163–1164, 20:65–21:8. The message "may also include a link to a remediation server or the IP address of the remediation server 66 that a user may click on." Appx1164, 21:8–11. The notification message is used by the device's "posture plug-ins," which are "provided by the manufacturer of an application, or third parties." Appx1163, 20:60–64, Appx1158, 9:11–13. Posture plug-ins "can be maintained by virus software" or "by the operating system of the computerized device 22." Appx1158, 9:21–24. Such plug-ins use an "extensible messaging format," such as "extensible markup language (XML)," which is a "well-defined, application-independent form for representing information or data." Appx1158, 9:6–11. The notification messages also use that format (e.g., XML) so that "third-party manufacturers of posture plug-ins 32 can recognize the information contained in the notification messages and act on these notifications accordingly." Appx1163, 20:60–64.

In "another example" (not shown in Figure 5), instead of immediately redirecting traffic to a remediation server using a redirection access instruction, the computerized device simply "displays the redirection access instruction" to "inform[] a user as to the results of the posture validation, resulting network access, and any actions that may need to be performed for remediation purposes." Appx1163, 20:38-44. Gleichauf does not explain how this information display is achieved (e.g., whether by a posture plug-in or by some other mechanism).

### b. Lewis

Like Gleichauf, Lewis describes network security measures, including verifying the configuration state of a device that seeks to access a network. Appx1234, 4:7-9. Lewis's system is highly similar to Gleichauf's, with the primary difference being that Lewis specifies the use of a *web page* to deliver a quarantine notification to a user, while Gleichauf merely suggests presenting a "text message" on "a user console." Appx1155, 4:63-67, Appx1164, 21:17-20, Appx1237, 10:61-66.

Lewis provides "a system for ensuring that machines having invalid or corrupt states are restricted from accessing network resources." Appx1234, 4:7-9. Lewis describes how the device must provide a "bill of health" to a quarantine server before gaining access to the network. Appx1234, 4:13-15. The quarantine server determines if the bill of health is valid or invalid. Appx1234, 4:16-23. A valid bill of

health indicates that the device has up-to-date security software, so the device is granted access to the network. Appx1234, 4:18–21. An invalid bill of health indicates that the device lacks security measures sufficient for access to the network, so the device is put in a lock-down configuration. Appx1239, 13:44–52. The lock-down configuration puts the device in quarantine. Appx1239, 13:63–65.

Like Gleichauf, Lewis describes informing a user that the user's device has been quarantined and of the necessary corrective actions. Appx1237, 10:61–66. In Lewis, however, that information is delivered in the form of a web page, provided by a quarantine server. Appx1237, 10:61–66. If the user performs the corrective action and submits an updated bill of health that is valid, the device is permitted access to the network. Appx1239, 13:12–15, 13:52–56.

### a.   Ovadia

Though Ovadia's disclosures are not at issue in this appeal, Ovadia is generally summarized here for completeness. Like Gleichauf, Ovadia is highly similar to the '705 patent. Ovadia discloses network security measures and describes steps to ensure that a device seeking to access a network has an authorized configuration. Appx1193, 1:8–11, Appx1178, Abstract.

Ovadia's security scheme generates security keys, including attestation identity keys ("AIKs"), using a trusted platform module. Appx1178, Abstract. The

trusted platform module is used "to verify [that] a current configuration of a subscriber station platform is an authorized configuration." Appx1178, Abstract. A subscriber station seeking network access "sends authentication information including a manifest signed with the SS's [subscriber station's] private AIK key." Appx1178, Abstract. An authentication server receives the information and authenticates the subscriber station via the subscriber station's public AIK key. Appx1178, Abstract.

Ovadia supplies a single limitation in Cisco's obviousness combination. Cisco presented extensive evidence demonstrating why a person of skill in the art would have combined Gleichauf and Ovadia, but the Board did not reach that question because it based its Decision solely on whether a person of skill in the art would have combined Gleichauf and Lewis.

## B.  Procedural History

### 1.  Cisco's IPR Petition

#### a.  Cisco's Obviousness Challenge

In March 2021, Cisco filed an *inter partes* review challenging claims 1–3, 5–13, and 15–19 under the following obviousness ground:

| Claims | Prior Art |
|---|---|
| 1–3, 5–13, 15–19 | Gleichauf, Ovadia, Lewis |

Appx149 (Petition); *see generally* Appx133–205 (Petition). Cisco supported the analysis in its Petition with the expert testimony of Dr. A.L. Narasimha Reddy, who is the J.W. Runyon Professor of Electrical and Computer Engineering at Texas A&M University. Appx1016, Appx1021; *see generally* Appx1016–1125.

### b. Cisco's Five Obviousness Rationales for Combining Gleichauf and Lewis

As relevant to this appeal, Cisco's Petition presented five independent reasons why a POSITA would have combined Gleichauf and Lewis as proposed by Cisco with respect to limitations 1.8 and 1.9. Cisco's first two reasons relied directly on the rationales discussed in *KSR* as being sufficient to show obviousness. Cisco's next three reasons identified various benefits that a POSITA would have understood to be gained through the proposed combination. Each of these five rationales for combining Gleichauf and Lewis—any one of which is sufficient to support the proposed combination—is briefly stated below:

*First*, Cisco explained that "[t]he combination would have been obvious because it uses the known technique of redirection of device traffic to a quarantine server that serves a webpage to the device, as in Lewis, to improve a similar method of traffic redirection, as in Gleichauf, in the same way." Appx159 (Petition, citing Appx1049–1050, ¶ 67 (Reddy Decl.)).

*Second*, Cisco explained that "[t]he combination would also have been obvious because it is merely the application of Lewis's known technique of serving a web page to a quarantined device with information and remediation instructions to Gleichauf's and Ovadia's known methods of providing a notification message identifying reasons for quarantine, yielding predictable results." Appx159 (Petition, citing Appx1050–1051, ¶ 68 (Reddy Decl.)).

*Third*, Cisco explained that "[a] POSITA would have known that serving a web page with remediation instructions to a quarantined device from a quarantine server would beneficially provide information to the user while simultaneously preventing the device from accessing protected network resources." Appx159 (Petition, citing Appx1237, 10:61–66, Appx1239, 13:63–14:1, Appx1050–1051, ¶ 68 (Reddy Decl.)).

*Fourth*, Cisco explained that Lewis's quarantine web page would be advantageous to Gleichauf's notification messages because "[r]edirection to Lewis's quarantine server would be triggered by the user opening a browser and attempting to access network resources," and "[t]he webpage served by the quarantine server would be displayed in the browser that the user already has opened." Appx159–160 (Petition, citing Appx1237, 10:63–66 (Lewis), Appx1050–1051, ¶ 68 (Reddy Decl.)). That method "would advantageously avoid necessitating additional software

components running on the device to receive and display the notification message to the user." Appx160 (Petition, citing Appx1155, 4:56–60, Appx1200, 16:62–65, Appx1050–1051, ¶ 68 (Reddy Decl.)).

*Fifth*, Cisco explained that "[s]erving a webpage from a quarantine server would also provide the quarantined device's user the option to proceed with the remediation or terminate the connection attempt." Appx160 (Petition, citing Appx1051–1052, ¶ 69 (Reddy Decl.)). For example, "[a] user that does not have the time to remediate security issues (e.g., a user attempting access from an airport terminal) may opt to terminate the connection attempt." Appx160.

These five rationales are summarized for convenience in the table below:

| | Cisco's Obviousness Rationales | Board's Analysis |
|---|---|---|
| **Reason #1** | Combining Gleichauf and Lewis as proposed uses the known technique of redirection of device traffic to a quarantine server that serves a web page to the device (as in Lewis) to improve a similar method of traffic redirection (as in Gleichauf) in the same way. | Board did not address |
| **Reason #2** | Combining Gleichauf and Lewis as proposed merely applies Lewis's known technique of serving a web page to a quarantined device with information and remediation instructions to Gleichauf's and Ovadia's known methods of providing a notification message identifying reasons for quarantine, yielding predictable results. | Board did not address |

| | | |
|---|---|---|
| **Reason #3** | Serving a web page with remediation instructions to a quarantined device from a quarantine server would beneficially provide information to the user while simultaneously preventing the device from accessing protected network resources. | Board rejected based on conclusion that Gleichauf alone provides this benefit. Appx31–32. |
| **Reason #4** | Lewis's quarantine web page would be advantageous to Gleichauf's notification messages because redirection to Lewis's quarantine server would be triggered by the user opening a browser and attempting to access network resources, and the webpage served by the quarantine server would be displayed in the browser that the user already has opened, thereby avoiding a need for additional software to display messages. | Board rejected based on conclusion that Gleichauf alone provides this benefit. Appx32–33. |
| **Reason #5** | Serving a webpage from a quarantine server would provide the quarantined device's user the option to proceed with the remediation or terminate the connection attempt. | Board rejected based on conclusion that Gleichauf alone provides this benefit. Appx33–34. |

## 2.    The Board's Institution Decision

The Board instituted review in September 2021. *See* Appx82. In its Institution Decision, the Board rejected K.Mizra's argument from its preliminary response in which K.Mizra contended that Cisco had not provided a sufficient motivation to "substitute Gleichauf's notification message with Lewis's quarantine webpage" because Cisco allegedly did not demonstrate that "Gleichauf's notification message was *insufficient* for meeting its objectives." Appx322 (Board summarizing K.Mizra's argument at Appx265 (Preliminary Resp.)).

The Board properly rejected K.Mizra's argument as legally incorrect under *KSR*, explaining that "[t]o the extent Patent Owner argues that a showing of a shortcoming in a reference is required to demonstrate a motivation to combine with another reference, we disagree with Patent Owner's argument." Appx323. Accordingly, the Board concluded that "we credit Dr. Reddy's testimony and conclude that Petitioner sufficiently articulates a reason why a person of ordinary skill in the art would have been motivated to combine Gleichauf, Ovadia, and Lewis in the manner proposed by Petitioner with a reasonable expectation of success in doing so." Appx323. In short, at the institution stage, the Board correctly recognized the "expansive and flexible approach" to the obviousness determination recognized in *KSR*, and applied that flexible analysis when instituting the proceeding. Appx323 (quoting *KSR*, 550 U.S. at 415).

### 3. Post-Institution Proceedings

In its Patent Owner Response, K.Mizra focused primarily on its argument (not relevant to this appeal) that a person of skill in the art would not have combined Gleichauf and Ovadia with a reasonable expectation of success. *See generally* Appx384–418. With respect to combining Gleichauf and Lewis, however, K.Mizra raised only a brief argument, i.e., that Gleichauf always directs users to a remediation server, so "Gleichauf's system works for its intended purpose of remediating

devices, and there is no rationale to redirect traffic from a remediation server to anywhere else." *See* Appx404–405; *see generally* Appx403–405. Nowhere in the Patent Owner Response did K.Mizra specifically address the five reasons Cisco provided as to why a POSITA would have combined Gleichauf and Lewis. And nowhere in the Patent Owner Response did K.Mizra contend that the three benefits Cisco identified as resulting from the combination would have already been satisfied by Gleichauf itself. Instead, K.Mizra argued (incorrectly) that Gleichauf *always* directs traffic to its remediation server and, thus, a user would expect to have the user's device remediated. Appx404.

In its Reply, Cisco responded to K.Mizra's argument by noting K.Mizra's failure to address Cisco's proposed rationales, Appx453, and reiterating the reasons Cisco's expert previously outlined regarding why a person of skill in the art would have combined Gleichauf and Lewis. *See* Appx451–453.[5]

In its Sur-Reply, K.Mizra first repeated its same argument that "Gleichauf *always* directs traffic to a remediation server," and "a POSITA would not redirect traffic from a remediation server that already fulfills its function of remediating

---

[5] After Cisco filed its Reply, the Board granted two separate parties' motions for joinder, instituted review of those joinder IPR petitions, and consolidated those cases into Cisco's ongoing *inter partes* review. *See* Appx3, Appx471–479 (Forescout Technologies, Inc.), Appx480–489 (Hewlett Packard Enterprise Company).

insecure devices to an extraneous quarantine notification page." Appx510 (emphasis original).

Then, K.Mizra raised a new argument: "Petitioner never explained why a quarantine notification page *hosted on a separate 'quarantine server'* as claimed . . . should be used to notify users of the need for remediation when Gleichauf's remediation server itself could do so—and remediate the device." Appx510 (emphasis original). This is where K.Mizra first contended that "[a]ll of the rationales proffered by Petitioners apply just as equally to a notification page served by the remediation server as suggested by Gleichauf" and that "[n]one of Petitioner's rationales in its Reply explain the need for a separate 'quarantine server' to serve the quarantine notification page when the remediation server would suffice." Appx510. K.Mizra then further argued that "even if a POSITA felt the need for a quarantine notification page, Petitioner fails to show why a separate quarantine server would be used to display the page instead of the remediation server." Appx510.

Notably, K.Mizra did not cite a single paragraph of its expert's declaration to support these new arguments, given that they were raised for the first time in K.Mizra's Sur-Reply. *See* Appx510. The sole piece of evidence K.Mizra cited for these new arguments actually had nothing to do with the arguments being made. *See*

Appx2511, 53:8–17 (Reddy Depo. Tr.). There, Cisco's expert merely testified that the purpose of the remediation server is remediation: "if the device follows through the remediation steps recommended, the device could be remediated." Appx2511, 53:15–17.

Given that K.Mizra waited until its Sur-Reply to raise these arguments, Cisco had no opportunity to address the new arguments through briefing or with appropriate evidence.

After Cisco filed its Reply but before the oral hearing, the composition of the Board panel presiding over this *inter partes* review changed. *See* Appx468–470.

### 4. The Final Written Decision

In its Final Written Decision, the Board began by noting that Cisco presented "several reasons" why a person of ordinary skill in the art would have combined Gleichauf and Lewis as Cisco proposed. Appx29–30. But the Board then proceeded to address just three of those five rationales, focusing solely on the three benefits Cisco identified as resulting from its proposed combination.

In addressing those three rationales, the Board changed course from its Institution Decision by applying a rigid, benefit-based approach to obviousness, rather than the flexible approach required under *KSR*. Specifically, the Board used a single line of reasoning to reject those three rationales: that Cisco "does not explain

sufficiently why a person of ordinary skill in the art would have looked to Lewis to modify Gleichauf, as proposed, when Gleichauf provides all of the Petitioner-identified benefits or advantages of the proposed combination of Gleichauf and Lewis." Appx30.

More specifically, as to Cisco's third rationale (that a web page with remediation instructions would provide information to a user while also preventing the user's device from accessing protected network resources), the Board found that Gleichauf already provides that benefit without the need for Lewis's quarantine server. The Board noted that Gleichauf discloses "notification messages" displayed to the user indicating that the device has been quarantined, and that Gleichauf prevents quarantined devices from accessing the protected network. Appx31–32.

As to Cisco's fourth rationale (that Lewis's web page would be better than Gleichauf's message because the web page could be displayed in the browser that the user already has open, rather than through separate software components used to display messages), the Board developed and applied its own view of the evidence—not argued by any party—to find that Gleichauf's messages provide the same benefit because they are generated in an application-independent format such as XML. Appx32. The Board further concluded that Gleichauf "indicates that the notification message may be displayed on a browser using XML pages"—or, at least

that a POSITA "could implement a webpage as part of the notification" even if Gleichauf did not disclose such a web page. Appx32–33.

Finally, as to Cisco's fifth rationale (that providing a web page from a quarantine server would give the user an option to either proceed with remediation immediately or terminate the connection attempt), the Board again found that Gleichauf already contemplates such a choice. Appx33–34. The Board relied on Gleichauf's disclosure that its notification messages may include a link to a remediation server that a user may click on. Appx34.

Thus, the Board ultimately concluded that "Gleichauf alone provides all of the alleged benefits or advantages of the proposed combination of Gleichauf and Lewis identified by Petitioner," Appx34, and that a POSITA therefore would not have modified Gleichauf as Cisco proposed. Appx35 (concluding that Cisco had not explained why a POSITA would have introduced "significant changes to the architecture or design of Gleichauf's network when Gleichauf alone already provides all of the alleged benefits or advantages of the proposed combination identified by Petitioner"). For this reason, the Board found that Cisco had not demonstrated that combining Gleichauf and Lewis would have been obvious, thus entirely disposing of Cisco's unpatentability challenge.

# SUMMARY OF THE ARGUMENT

The Board's determination that a person of ordinary skill in the art would not have combined Gleichauf and Lewis is unsupportable for multiple independent reasons:

*First*, the Board misapplied the law by requiring Cisco to identify a benefit to be obtained through the proposed combination and precluding a finding of obviousness where the proposed combination merely "unites old elements with no change in their respective functions" and substitutes one option for another. *See KSR*, 550 U.S. at 416 (quoting *Great Atl. & Pac. Tea Co. v. Supermarket Equip. Corp.*, 340 U.S. 147, 152–53 (1950)). The Board's rigid requirement that the combination provide some "benefit" is contrary to *KSR*. Moreover, its narrow view of the obviousness analysis also caused the Board to overlook the first two rationales that Cisco presented as to why a POSITA would have combined Gleichauf and Lewis. Those rationales focused specifically on the predictability of the proposed combination and noted that the combination would merely use one reference to improve another *in the same way*. Under this Court's precedents, those arguments should have been addressed by the Board and should have been found sufficient to establish obviousness.

*Second*, the Board particularly erred in its analysis of Cisco's fourth rationale for combining Gleichauf and Lewis (that Lewis's web page would be better than Gleichauf's message because the web page could be displayed in the browser that the user already has open, rather than through separate software components for displaying messages). The Board's factual findings regarding this rationale lack any evidentiary support. To find that Gleichauf already discloses the benefit identified by Cisco's fourth rationale, the Board had to find that Gleichauf discloses displaying its messages on a web browser. But Gleichauf never once discloses a web browser. K.Mizra's counsel admitted as much during the oral hearing, as did the Board, when it had to acknowledge that a modification to Gleichauf would be required to have Gleichauf display a web page. *See* Appx32. In essence, the Board found that it would have been obvious to modify Gleichauf to incorporate a browser-based quarantine message (as in Lewis)—yet, in a bizarre non sequitur, concluded that there would not be a motivation to combine the teachings of Gleichauf and Lewis.

*Third*, in rejecting Cisco's obviousness rationales, the Board violated the Administrative Procedure Act, due process, and fundamental principles of party presentation. Specifically, as to Cisco's fourth rationale, the Board relied on reasoning and evidence that no party ever discussed. The Board crafted its own theory of the evidence to rebut Cisco's contentions—without ever giving notice of

or an opportunity to address that new reasoning and evidence. In doing so, the Board violated fundamental tenets of both the Administrative Procedure Act and due process. That alone requires at least vacatur and remand. Meanwhile, in addressing whether Gleichauf already discloses the benefits of the proposed combination, the Board abused its discretion by basing its Decision solely on an argument that K.Mizra did not raise until its Sur-Reply. Not until the Sur-Reply did K.Mizra contend that a POSITA would not have been motivated to modify Gleichauf using Lewis's quarantine server because, according to K.Mizra, the benefits identified by Cisco in its Petition would have already been present in Gleichauf without needing Lewis. Had Cisco been given an opportunity to respond to those arguments through briefing and appropriate evidence (as needed), Cisco could have thoroughly addressed K.Mizra's arguments. But Cisco never had that opportunity.

Accordingly, for multiple reasons, the Board's Decision should not be sustained. The Court should reverse the Board's unfounded factual findings, vacate the Decision, and remand to the Board for an obviousness analysis under the proper legal and procedural standards.

## ARGUMENT

## I.    Standard of Review

The Supreme Court has repeatedly held that "[t]he ultimate judgment of obviousness is a legal determination." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398,

427 (2007); *see also Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17 (1966) ("[T]he ultimate question of patent validity is one of law . . . ."). As part of that overall analysis, the obviousness inquiry "lends itself to several basic factual inquiries," including "the scope and content of the prior art"; "differences between the prior art and the claims at issue"; and "the level of ordinary skill in the pertinent art." *Graham*, 383 U.S. at 17; *see also ESIP Series 2, LLC v. Puzhen Life USA, LLC*, 958 F.3d 1378, 1383 (Fed. Cir. 2020).[6] This Court has stated that the presence or absence of a motivation to combine references is a question of fact, *In re Gartside*, 203 F.3d 1305, 1316 (Fed. Cir. 2000), though earlier cases characterized the requirement of a suggestion to combine references as a "legal standard" to guide "fact-finding functions performed en route to final § 103 conclusions," *Panduit Corp. v. Dennison Mfg. Co.*, 810 F.2d 1561, 1568 (Fed. Cir. 1987); *see also* Joshua L. Sohn, *Re-Thinking the "Motivation-to-Combine" in Patent Law*, 48 AIPLA Q.J. 1, 4 (2020) (arguing motivation to combine should be viewed as a question of law lest it "swallow[] up the entire obviousness analysis").

Here, while Cisco does challenge the Board's specific factual findings made in the Board's motivation analysis (findings that are reviewed for substantial evidence),

---

[6] No party presented evidence of secondary considerations/objective indicia of non-obviousness in this case.

*see infra* Section III, Cisco also challenges the legal reasoning used by the Board to reject Cisco's proposed rationales as being insufficient to establish obviousness, *see infra* Section II. That question—whether the Board's reasoning is consistent with *KSR*—should be reviewed de novo as part of the overall obviousness analysis.

"Decisions related to compliance with the Board's procedures are reviewed for an abuse of discretion." *Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1367 (Fed. Cir. 2016). Similarly, the Board's decision whether to disregard arguments as improper under 37 C.F.R. § 42.23(b) is reviewed for an abuse of discretion. *Henny Penny Corp. v. Frymaster LLC*, 938 F.3d 1324, 1330 (Fed. Cir. 2019). However, "[w]hether the Board improperly relied on new arguments is reviewed *de novo*." *In re IPR Licensing, Inc.*, 942 F.3d 1363, 1369 (Fed. Cir. 2019) (citing *In re NuVasive, Inc.*, 841 F.3d 966, 970 (Fed. Cir. 2016)).

## II.   The Board misapplied the law of obviousness by categorically requiring a motivation to achieve a specific benefit, even when a proposed combination presents a predictable variation on the prior art that substitutes one known element for another with similar functionality.

The Board's decision should be reversed because it misapplied *KSR* and this Court's precedents. *KSR*, 550 U.S. at 407. *KSR* requires an "expansive and flexible" approach to obviousness, disavowing "rigid and mandatory formulas" and "formalistic conceptions." *Id.* at 419.

*KSR* explained that "when a patent 'simply arranges old elements with each performing the same function it had been known to perform' and yields no more than one would expect from such an arrangement, the combination is obvious." *Id.* at 417 (citation omitted); *see also id.* at 416 ("The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results."). Thus, while it "can be important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does," there is no place in the analysis for "rigid rule[s]" that "limit[]" the overall inquiry. *Id.* at 418–19.

Here, the Board did not follow the teachings of *KSR* or this Court's subsequent precedents. As summarized in the Statement of the Case, Cisco presented five independent reasons why a POSITA would have combined Gleichauf and Lewis as proposed by Cisco. The Board did not address Cisco's first two reasons for combining Gleichauf and Lewis. Instead, the Board focused solely on the three benefits-based reasons for combining those references. *See* Appx30–35. Ultimately, the Board rejected those proposed rationales by concluding that Gleichauf already provides the benefits Cisco identified. *See* Appx30 (concluding that Cisco "[did] not explain sufficiently why a person of ordinary skill in the art would have looked to Lewis to modify Gleichauf, as proposed, when Gleichauf provides all of the

Petitioner-identified benefits or advantages of the proposed combination of Gleichauf and Lewis"). This was the sole basis for the Board's non-obviousness decision. Appx35–38.

There are two fundamental problems with the Board's approach, each of which warrant at least vacatur and remand.

### A. The Board's focus on the benefits to be obtained by a combination caused the Board to overlook and fail to address Cisco's first two obviousness rationales.

By focusing solely on benefits to be obtained by the proposed combination, the Board ignored Cisco's *other* arguments, namely that the proposed combination is merely a predictable variation of Gleichauf that substitutes one known element for another with the same functionality. Cisco's Petition explained that combining Gleichauf and Lewis would have been obvious because the combination merely uses a "known technique of redirection of device traffic to a quarantine server that serves a webpage to the device, as in Lewis, to improve a similar method of traffic redirection, as in Gleichauf, in the same way." Appx159 (Petition, citing Appx1049–1050, ¶ 67 (Reddy Decl.)). Likewise, Cisco explained that the combination would have been obvious because it would be "merely the application of Lewis's known technique of serving a webpage to a quarantined device with information and remediation instructions to Gleichauf's and Ovadia's known methods of providing a

notification message identifying reasons for quarantine, yielding predictable results." Appx159 (Petition, citing Appx1050–1051, ¶ 68 (Reddy Decl.)).

These two proposed rationales are sufficient under *KSR* and this Court's precedents because Cisco showed that the method disclosed in the '705 patent did nothing more than rearrange "familiar elements" using "known methods" to yield "predictable results." *See KSR*, 550 U.S. at 416–17; *id.* at 417 ("[I]f a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill."). Where the prior art was so similar, and the choice of elements readily predictable, Cisco did not need to show a specific motivation to improve Gleichauf to achieve a particular benefit. For example, in *Uber Technologies, Inc. v. X One, Inc.*, this Court reversed the Board's conclusion that a POSITA would not have been motivated to combine two references, holding that the combination "would have been a 'predictable variation' of [one reference], using a technique that was known to one of ordinary skill in the art." 957 F.3d 1334, 1340 (Fed. Cir. 2020). The fact that the two proposed solutions "would have required different implementation[s]" did not change this Court's reasoning. *Id.* at 1341.

The Board's analysis therefore constitutes both legal error (because Cisco's first two proposed rationales are legally sufficient under *KSR*) and procedural error (because the Board failed to engage with Cisco's arguments at all). *See Provisur Techs., Inc. v. Weber, Inc.*, 50 F.4th 117, 125 (Fed. Cir. 2022) (holding that the Board erred when it "[did] not substantively engage with [the petitioner's] arguments" and where "the Board never directly or implicitly addressed the arguments that [the petitioner] had set forth in its petition"); *see also Shinn Fu Co. of Am., Inc. v. Tire Hanger Corp.*, 701 F. App'x 942, 944–46 (Fed. Cir. 2017) (non-precedential) (vacating and remanding where the Board "did not provide any analysis with regard to the manner in which [a petitioner] proposed its key obviousness combination" and noting the Board's "obligation [] to address the arguments that the parties present to it").

Further, a statement made by K.Mizra's counsel during the oral hearing confirms that Cisco's first two rationales are correct. K.Mizra's counsel *admitted* that "a POSITA would think to implement a remediation webpage as part of that [i.e., Gleichauf's] notification communication." Appx582, 43:14–15. In other words, K.Mizra's counsel admitted that a person of ordinary skill in the art would have thought to make the very modification Cisco proposed, which is the epitome of obviousness. The Court should reverse the Board's bizarre finding that, because the

modification was so obvious, a person of ordinary skill would not have made the modification.

In sum, the two *KSR*-based rationales discussed above should have been sufficient to establish obviousness, particularly in light of the admissions from K.Mizra's counsel during argument. The Court should therefore reverse. At a minimum, however, the Court should vacate and remand for the Board to address those rationales in the first instance.

**B.  The Board erred as a matter of law by concluding that the existence of certain functionality in a reference would preclude obviousness where another reference would achieve that functionality in another way.**

The Board's analysis of the three rationales that it *did* address is legally infirm. Under the Board's reasoning, the existence of a feature or functionality in a reference precludes combining that reference with another reference in way that would achieve that functionality or benefit in another way.

The Board cited only two cases to support this narrow understanding of the obviousness analysis. *See* Appx36 (citing *In re Anova Hearing Labs, Inc.*, 809 F. App'x 840, 843 (Fed. Cir. 2020) (non-precedential), and *Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1369 (Fed. Cir. 2012)). Neither case justifies the Board's legal reasoning. The brief suggestion in *Kinetic Concepts* that a POSITA would have no reason to combine devices where each independently accomplished

similar functions and operated effectively was not dispositive or necessary to the holding in that case because (a) the patent challenger "never offered evidence articulating why a person having ordinary skill in the art would combine" the references, 688 F.3d at 1368–69, (b) there was "significant evidence of teaching away," *id.* at 1369, and (c) the references did not even disclose all the limitations of the claimed invention, *see id.* at 1366. Similarly, in *Anova Hearing Labs*, the Court merely vacated the Board's analysis and remanded "to give the Board the opportunity to explain its reasoning," given that the Board did not explain "what features of the references, or even which references, would be combined to achieve the claimed invention." 809 F. App'x at 843. To the extent the Court's opinion suggests that functionality of one reference already existed in another (which is not clear from the short opinion), the Court did not appear to find that conclusive as to the obviousness analysis—otherwise, the remand would have been unnecessary. *See id.*

In short, the Board failed to cite any precedent holding that the existence of certain functionality or a certain benefit in one reference necessarily precludes a combination with another reference that would offer a similar benefit through another means. Nor would that sort of categorical rule make sense in light of the "expansive and flexible approach" to obviousness described in *KSR*. *See* 550 U.S. at

415. Indeed, *KSR* itself explains that "when a patent claims a structure already known in the prior art that is altered by the mere substitution of one element for another known in the field, the combination must do more than yield a predictable result." *KSR*, 550 U.S. at 416. And as this Court has made clear, "[i]t's not necessary to show that a combination is 'the *best* option, only that it be a *suitable* option.'" *Intel Corp. v. Qualcomm Inc.*, 21 F.4th 784, 800 (Fed. Cir. 2021) (emphasis original) (quoting *PAR Pharm., Inc. v. TWI Pharms., Inc.*, 773 F.3d 1186, 1197–98 (Fed. Cir. 2014)); *see also E.I. du Pont De Nemours & Co. v. MacDermid Printing Sols., L.L.C.*, 657 F. App'x 1004, 1014 (Fed. Cir. 2016) (non-precedential) ("Even if it were true that the thermal process was not the best method for producing high quality images, the legally proper question is whether the thermal process would be a suitable option in *some* respects, not necessarily in *every* respect." (emphasis original)).

Here, even if the three benefits identified by Cisco were already present in Gleichauf (which is *not* the case as to at least one of those benefits, *see infra* Section III),[7] achieving those benefits in a different way would still be a "suitable option" that would have been obvious to a POSITA. *See Intel*, 21 F.4th at 800. This

---

[7] As discussed *infra* in Section IV.A, K.Mizra did not raise this argument or cite this evidence, and the Board abused its discretion by coming up with such arguments on its own.

is particularly true regarding the Board's analysis of Cisco's fourth rationale (that a POSITA would have used Lewis's quarantine server to display a web page, so that the user could receive the quarantine message in the web browser the user already has open). As explained *infra* in Section III, there is no evidence to support a finding that Gleichauf already discloses providing its notification message through a web page. No party even raised that argument. Regardless, to the extent what the Board *intended* to say is that Gleichauf could have been *modified* to have its remediation server display a web page, and that such a modification would have been *better* than the modification Cisco proposed (using Lewis's separate quarantine server to display a web page), that reasoning would directly contradict this Court's case law. Again, "[i]t's not necessary to show that a combination is 'the *best* option, only that it be a *suitable* option.'" *Intel*, 21 F.4th at 800 (emphasis original) (quoting *PAR Pharm.*, 773 F.3d at 1197–98). Whether a better modification may have existed is legally irrelevant. *See id.*

Nor does the Board's suggestion that Cisco's proposed combination would "introduce such significant changes to the architecture or design of Gleichauf's network" justify the Board's focus on whether the purported benefits were already in Gleichauf. *See* Appx35. The Board cites no evidence suggesting the combination would have been a "significant" change to Gleichauf, instead merely pointing to

Cisco's explanation of the combination. Appx35 (citing Appx158–161 (Pet.), Appx451–453 (Reply), Appx1049–1052, ¶¶ 66–71 (Reddy Decl.)). Thus, to the extent the Board intended that one-off suggestion to be a fact-finding supporting its analysis, that finding lacks substantial evidence support. Moreover, that reasoning still would not change the obviousness analysis because, again, "[i]t's not necessary to show that a combination is 'the *best* option, only that it be a *suitable* option.'" *Intel*, 21 F.4th at 800 (emphasis original) (quoting *PAR Pharm.*, 773 F.3d at 1197–98).

Accordingly, the Board erred as a matter of law in concluding that existing functionality in Gleichauf would have precluded a POSITA from finding it obvious to consider other options to accomplish that same functionality.

## III. Regarding Cisco's fourth obviousness rationale, the Board's finding that Gleichauf describes notification messages displayed in a browser using XML pages lacks any evidentiary support.

In reaching its decision regarding Cisco's fourth rationale, the Board created its own theory of what a POSITA *could* have done with XML—then used that new theory to find that a POSITA would not need to make the combination Cisco proposed. *See* Appx32. As made clear in Section IV.A below, the Board should have never considered such an argument, and that alone is sufficient to vacate and remand for a proper analysis. *See infra* Section IV.A.

In our "adversarial system of adjudication," tribunals decide cases based on the arguments and evidence presented to them. *See United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) ("In our adversarial system of adjudication, we follow the principle of party presentation," where parties are "responsible for advancing the facts and argument entitling them to relief" (quoting *Castro v. United States*, 540 U.S. 375, 386 (2003) (Scalia, J., concurring in part and in judgment)). And this is for good reason: without the benefit of having evidence tested and refined through the adversarial process, there is an inherent risk that the tribunal may not fully understand or may misinterpret the evidence before it. That is exactly what happened here.

Specifically, the Board rejected Cisco's fourth rationale based on its own interpretation of Gleichauf and what the Board believed a POSITA *could* have done with that reference. *See* Appx32. But the Board's findings are wholly untethered from the evidence and arguments presented by the parties and lack any factual underpinning. Accordingly, even under substantial evidence review, the Board's findings cannot be sustained and should be reversed.

In its fourth rationale for combining Gleichauf and Lewis, Cisco explained that Lewis's quarantine web page would be advantageous to Gleichauf's existing notification messages because "[r]edirection to Lewis's quarantine server would be

triggered by the user *opening a browser* and attempting to access network resources," and "[t]he webpage served by the quarantine server would be displayed *in the browser that the user already has opened*." Appx159–160 (Petition, citing Appx1237, 10:63–66, Appx1050–1051, ¶ 68 (Reddy Decl.)) (emphasis added). That method "would advantageously avoid necessitating additional software components running on the device to receive and display the notification message to the user." Appx160 (Petition, citing Appx1155, 4:56–60, Appx1200, 16:62–65, Appx1050–1051, ¶ 68 (Reddy Decl.)).

The Board rejected this rationale by concluding that "Gleichauf's notification messages [] provide the same benefit without the need for Lewis's quarantine webpage because Gleichauf discloses that the notification messages are generated in an '*application-independent*' form, such as the XML (extensible markup language) format." Appx32 (emphasis by Board); *see also* Appx33. Specifically, the Board found that "Gleichauf indicates that the notification messages ***may be displayed on a browser using XML pages***, without the need for additional software running on the device to receive and display the notification message to the user." Appx32 (emphasis added).

The Board, however, did not cite a single piece of evidence to support this reasoning, particularly its finding regarding Gleichauf's notification messages being

"displayed on a browser using XML pages." Appx32. Nor could it. Gleichauf never discloses displaying its notification messages in a browser. K.Mizra's counsel admitted as much during the oral hearing. *See* Appx582, 43:7–15 (discussing Gleichauf's notification messages but admitting that "[i]t's unclear whether that's a web page or not"). In fact, Gleichauf never refers to a "browser" at all. And the mere reference in Gleichauf to XML does not disclose a web browser either. To the contrary, Gleichauf's reference to XML appears only in the context of a computer's "posture plug-ins," which are "provided by the manufacturer of an application, or third parties" and are "maintained by virus software" or "by the operating system of the computerized device 22." Appx1163, 20:54–64, Appx1158, 9:11–13, Appx1158, 9:21–24. Those "plug-ins" have nothing to do with web browsers. The Board's emphasis on XML being "application-independent" is similarly taken out of context. Appx32. While the Board seems to suggest that "application-independent" means that any application, including a web browser, could understand XML, nothing in Gleichauf supports that assumption. Appx32. Again, Gleichauf's references to XML are only in the context of "posture plug-ins" that "can recognize the information contained in the notification messages." Appx1163, 20:54–64.

The only "evidence" the Board cited for its finding that Gleichauf's notification messages may be "displayed on a browser" using XML was attorney argument made by K.Mizra's counsel at the close of the oral hearing. Appx32 (citing Appx582, 43:7–15). But that is the same part of the hearing where K.Mizra's counsel conceded that Gleichauf does not discuss web pages. *See* Appx582, 43:12. Seemingly recognizing the lack of such disclosure in Gleichauf, the Board paraphrased K.Mizra's counsel as arguing that "even if Gleichauf only teaches 'messages,' a person of ordinary skill in the art ***could implement*** a webpage as part of the notification." Appx32 (emphasis added).

Such attorney argument cannot support the Board's finding for multiple reasons. First, it is merely attorney argument—not evidence. *See Gemtron Corp. v. Saint-Gobain Corp.*, 572 F. 3d 1371, 1380 (Fed. Cir. 2009) ("[A]ttorney argument . . . ***is not evidence*** and cannot rebut . . . evidence . . . ."). Neither party presented evidence as to whether Gleichauf's notification messages may be displayed on a browser using XML because no party raised this argument.

Second, the Board's reasoning fundamentally misapplies the law of obviousness—and simply lacks coherency. It makes no sense for the Board to conclude that Gleichauf already "provide[d] the same benefit" as the proposed combination, when the Board had to contemplate modifications to Gleichauf to

reach that finding. The Board's statement that a POSITA "*could* implement a webpage" as part of Gleichauf merely confirms that no such web page already existed in Gleichauf. Appx32. In other words, if a POSITA had to add features to Gleichauf to achieve that benefit, clearly Gleichauf's system did not already provide that benefit—otherwise, no modification would have been required. Thus, the Board's finding that "Gleichauf indicates that the notification messages may be displayed on a browser"—the finding that served as the sole basis for the Board's conclusion that Gleichauf already provides the same benefit as the proposed combination—lacks any factual underpinning and cannot be sustained.[8] Gleichauf discloses nothing of the sort; the Board cites no evidence to support that finding; and the Board's own characterization of K.Mizra's counsel's arguments shows that Gleichauf does *not* already provide that benefit.

Where a factual finding lacks any basis in the evidentiary record, that finding is not supported by substantial evidence. The Board's analysis of Cisco's fourth motivation-to-combine rationale is not supported by substantial evidence and, in fact, is refuted by K.Mizra's admissions at oral argument. *See* Appx582, 43:7–15; Appx582, 43:14–15. The Court should reverse the Board's unsupported factual

---

[8] And, as discussed above in Section II, even if a purportedly better modification to Gleichauf might exist, that is legally irrelevant because a combination need not present the *best* option to render a claimed invention obvious. *Intel*, 21 F.4th at 800.

findings, find that a person of ordinary skill in the art would have found it obvious to combine the relevant teachings of Gleichauf and Lewis, and remand for the Board to consider the remaining issues regarding the obviousness of the challenged claims.

## IV. The Board committed multiple procedural errors that prejudiced Cisco and, at a minimum, require vacatur and remand.

In addressing Cisco's obviousness rationales, the Board violated procedural norms that significantly prejudiced Cisco.

When rejecting Cisco's fourth rationale, the Board created its own arguments and theory of the evidence, violating the Administrative Procedure Act, due process, and the basic principle of party presentation.

Meanwhile, in rejecting Cisco's three benefits-based rationales, the Board relied on an argument that K.Mizra raised for the first time in its Sur-Reply, similarly violating the Administrative Procedure Act and due process.

Each of these procedural errors warrants reversal, vacatur, and remand because any one of Cisco's obviousness rationales should have been sufficient to establish obviousness.

### A. As to Cisco's fourth obviousness rationale, the Board violated the Administrative Procedure Act, due process, and the doctrine of party presentation by creating its own arguments to reject that rationale.

The Court should reverse (or at least vacate) the Board's Decision regarding the motivation to combine Gleichauf and Lewis because the Board rejected Cisco's

fourth rationale based on an argument that no party raised—that Gleichauf already discloses displaying its notification message on a web page using XML. The Board did so without ever providing Cisco notice of or an opportunity to address the Board's new reasoning.

As noted above, for Cisco's fourth rationale as to why a POSITA would have combined Gleichauf and Lewis, Cisco explained that Lewis's quarantine web page would be advantageous to Gleichauf's notification messages because "[r]edirection to Lewis's quarantine server would be triggered by the user *opening a browser* and attempting to access network resources," and "[t]he webpage served by the quarantine server would be displayed *in the browser that the user already has opened*." Appx159–160 (Petition, citing Appx1237, 10:63–66 (Lewis), Appx1050–1051, ¶ 68 (Reddy Decl.)) (emphasis added). That method "would advantageously avoid necessitating additional software components running on the device to receive and display the notification message to the user." Appx160 (Petition, citing Appx1155, 4:56–60 (Gleichauf), Appx1200, 16:62–65, Appx1050–1051, ¶ 68 (Reddy Decl.)).

As discussed above in Section III, the Board rejected this rationale by concluding that "Gleichauf's notification messages, however, provide the same benefit without the need for Lewis's quarantine webpage because Gleichauf discloses that the notification messages are generated in an '*application-independent*'

53

form, such as the XML (extensible markup language) format." Appx32 (emphasis by Board). The Board further explained that "Gleichauf indicates that the notification messages *may be displayed on a browser* using XML pages, without the need for additional software running on the device to receive and display the notification message to the user." Appx32 (citing surrebuttal argument by K.Mizra's counsel, Appx582, 43:7–15 (Hr'g Tr.)) (emphasis added).

The Board came up with its theory regarding Gleichauf's use of XML to display notification messages on a browser out of whole cloth. *See* Appx32. K.Mizra never raised that argument in its Patent Owner Response or Sur-Reply. In fact, neither the Patent Owner Response nor the Sur-Reply even mention "XML" at all. *See generally* Appx384–418 (Patent Owner Resp.), Appx498–518 (Sur-Reply). This was not even a contention that came up during the oral hearing. *See generally* Appx540–584 (Hr'g Tr.). The first time Cisco became aware of the Board's new theory regarding Gleichauf's alleged use of web browsers to display its notification messages was when Cisco received the Final Written Decision.[9]

This Court has repeatedly held that "the Board must base its decision on arguments that were advanced by a party, and to which the opposing party was given

---

[9] As explained above in Section III, this procedural violation led the Board to make factual findings regarding Gleichauf's purported use of web browsers that lack any evidentiary support.

a chance to respond." *VLSI Tech. LLC v. Intel Corp.*, 53 F.4th 646, 654 (Fed. Cir. 2022) (quoting *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1381 (Fed. Cir. 2016)); *see also In re IPR Licensing, Inc.*, 942 F.3d 1363, 1368 (Fed. Cir. 2019); *Rovalma, S.A. v. Bohler-Edelstahl GmbH & Co. KG*, 856 F.3d 1019, 1027 (Fed. Cir. 2017). This rule stems not only from principles of procedural due process and the fundamental doctrine of party presentation, but also from the APA's specific requirements governing formal adjudications, including IPRs. *See Sineneng-Smith*, 140 S. Ct. at 1587–79 (reversing Ninth Circuit for deciding a case based on an issue no party raised).

For example, 5 U.S.C. § 556(d) provides for "a party . . . to submit rebuttal evidence . . . as may be required for a full and true disclosure of the facts." *See Dell Inc. v. Acceleron, LLC*, 818 F.3d 1293, 1301 (Fed. Cir. 2016). Similarly, 5 U.S.C. § 554(b)(3) requires that "[p]ersons entitled to notice of an agency hearing shall be timely informed of . . . the matters of fact and law asserted." And while this Court has often discussed § 554(b)(3) in the context of protections provided to patent owners, the same protections apply to petitioners in IPR proceedings. *See SAS Inst., Inc. v. ComplementSoft, LLC*, 825 F.3d 1341, 1351 (Fed. Cir. 2016) (discussing § 554(b)(3) and concluding that "[i]n an IPR proceeding, this class of persons

includes the petitioner"), *rev'd and remanded on other grounds sub nom. SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348 (2018).

In *Sineneng-Smith*, the Supreme Court reversed a court's decision that significantly departed from the principle of party presentation and remanded "for an adjudication of the appeal attuned to the case shaped by the parties rather than the case designed by the appeals panel." 140 S. Ct. at 1578. Similarly, this Court has vacated and remanded Board decisions that violated these fundamental procedural principles. For example, in *Nike, Inc. v. Adidas AG*, this Court vacated the Board's decision and remanded where "the Board's decision [] rest[ed] exclusively on an argument that the Board itself raised, addressed, and decided in its decision on remand, thereby depriving [a party] of 'notice or an opportunity to be heard at a meaningful point in the proceedings.'" 955 F.3d 45, 51–54 (Fed. Cir. 2020) (quoting *Genzyme Therapeutic Prods. Ltd. P'ship v. Biomarin Pharm. Inc.*, 825 F.3d 1360, 1367 (Fed. Cir. 2016)); *see also id.* (remanding to provide "the parties with an opportunity to respond").

Here, the Court should reverse (or at least vacate) the Board's Decision and remand for further proceedings because the Board violated these fundamental tenets here. Not only did neither party raise Gleichauf's brief mention of XML, the Board never gave the parties notice that it planned to rely on that aspect of Gleichauf—nor

an opportunity to address that disclosure in Gleichauf with appropriate arguments and evidence. Cisco was entitled to notice of "the matters of fact and law asserted," § 554(b)(3), yet it was deprived of that notice here. This at least warrants vacatur and remand of the Board's Decision so that the parties may properly address that evidence, though reversal with instructions to not consider such an argument would be more appropriate under *Sineneng-Smith*.

**B.  In finding a lack of motivation to combine based on benefits already allegedly present in Gleichauf, the Board violated its own rules, the Administrative Procedure Act, and due process because K.Mizra did not raise that argument until its Sur-Reply.**

The Board's Decision should also be reversed (or at least vacated) due to a second procedural violation: the Board's general theory for rejecting Cisco's third, fourth, and fifth combination rationales was an argument that K.Mizra raised for the first time in its Sur-Reply. Cisco had no opportunity to respond to that untimely argument with appropriate evidence or briefing. Thus, the Board should not have considered that argument whatsoever.

As described in the Statement of the Case, it was not until K.Mizra's Sur-Reply that K.Mizra argued that a POSITA would not have combined Gleichauf with Lewis's quarantine server because the benefits identified by Cisco would have already been present in Gleichauf, leaving no need to look to Lewis's quarantine server. *Compare* Appx403–405 (Patent Owner Resp.), *with* Appx509–511 (Sur-

Reply) (arguing there would be no need to use a quarantine notification page hosted on a separate quarantine server to notify users because Gleichauf's "remediation server itself could do so"); *see also* Appx553, 14:18–25 (H'rg Tr.) (Cisco's counsel identifying this as a new argument in sur-reply).

The Board's rules make clear that "[a] sur-reply may only respond to arguments raised in the corresponding reply and may not be accompanied by new evidence other than deposition transcripts of the cross-examination of any reply witness." 37 C.F.R. § 42.23(b). The Board's Consolidated Trial Practice Guide ("TPG") likewise underscores the limited scope of a patent owner's sur-reply. The TPG provides that "[w]hile replies and sur-replies can help crystalize issues for decision, a reply or sur-reply that raises a new issue or belatedly presents evidence may not be considered." TPG, 74. And, if the Board's rules were not clear enough already, the Board specifically placed K.Mizra on notice that any arguments not included in the Patent Owner Response may be deemed waived. Appx339 (Scheduling Order) ("Patent Owner is cautioned that any arguments not raised in the response may be deemed waived.").

Cisco's Reply did not include any arguments beyond those already included in the Petition. Cisco's Reply merely reemphasized some of the same rationales it

had already presented in its Petition. Appx453. Thus, nothing in Cisco's Reply justified an entirely new set of arguments from K.Mizra in its Sur-Reply.

This Court has, on a number of occasions, held that arguments not raised in a patent owner's response are forfeited. For example, in *Finjan, Inc. v. Cisco Systems, Inc.*, the Court deemed an argument not raised in the patent owner response to be waived where the patent owner "was on notice that such an omission would result in waiver." 837 F. App'x 799, 809 n.10 (Fed. Cir. 2020) (non-precedential) (pointing to the Board's warning in the scheduling order). Similarly, in *P Tech, LLC v. Intuitive Surgical, Inc.*, the Court relied on 37 C.F.R. § 42.23(b) and held that the Board did not abuse its discretion by declining to consider a patent owner's untimely arguments raised for the first time in its sur-reply. No. 2022-1102, 2022 WL 17688149, at *4 (Fed. Cir. Dec. 15, 2022) (non-precedential). This Court was even more explicit in *Iron Oak Technologies, LLC v. Samsung Electronics Co.*, where the Court held that "[t]he Board was *correct* to reject [an] argument [by patent owner] both because it was *raised for the first time in [patent owner's] sur-reply* and because it inaccurately reflects what is actually disclosed and claimed in the [] patent." 839 F. App'x 547, 548 (Fed. Cir. 2021) (non-precedential) (emphasis added). These cases confirm that arguments raised for the first time in a patent owner's sur-reply should not be considered.

In addition to being contrary to the Board's own rules, the Board's surprising reliance on K.Mizra's new argument deprived Cisco of an opportunity to respond to those arguments. Under this Court's case law, both the Administrative Procedure Act and due process require all parties to have a sufficient opportunity to respond to arguments raised in agency proceedings. *See e.g.*, *SAS Inst.*, 825 F.3d at 1351 (discussing 5 U.S.C. § 554(b)(3)).

Here, because K.Mizra waited until the final stage of briefing to raise this new argument, Cisco had no opportunity to address the argument through briefing, much less with appropriate responsive evidence from Cisco's expert. And even with Cisco flagging that this was an improper new argument raised on sur-reply, the Board still faulted Cisco for not addressing that untimely argument. *See* Appx35, Appx553, 14:18–25 (H'rg Tr.). Accordingly, reversal, vacatur, and remand is warranted for this independent reason. Upon remand, if the Board chooses to consider K.Mizra's untimely arguments, Cisco should then be given an opportunity to fully address those arguments through briefing and appropriate evidence.

## CONCLUSION

For these reasons, Cisco respectfully requests that the Court reverse the Board's findings that Cisco did not demonstrate unpatentability as to the challenged

claims, vacate the Board's Final Written Decision, and remand to the Board for further consideration of the arguments and evidence presented by the parties.

Respectfully Submitted,

**HAYNES AND BOONE, LLP**

*/s/ Theodore M. Foster*

Theodore M. Foster
David L. McCombs
Debra J. McComas
2323 Victory Avenue, Suite 700
Dallas, Texas 75219
Phone: (214) 651-5375
Fax: (214) 651-5940
*Theo.Foster@haynesboone.com*
*David.McCombs@haynesboone.com*
*Debbie.McComas@haynesboone.com*

Eugene Goryunov
600 Congress Avenue, Suite 2215
Chicago, Illinois 60601
Phone: (312) 216-1630
Fax: (312) 216-1621
*Eugene.Goryunov@haynesboone.com*

Angela M. Oliver
800 17th Street NW, Suite 500
Washington, D.C. 20006
Phone: (202) 654-4552
Fax: (202) 654-4552
*Angela.Oliver@haynesboone.com*

**Attorneys for Appellant Cisco Systems, Inc.**

# CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Fed. Cir. R. 32(b)(1) because:

■      this brief contains **<u>12,502</u>** words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b)(2).

2.      This brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and 32(a)(6) because:

■      this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Equity font.

*/s/ Theodore M. Foster*
Theodore M. Foster

**ADDENDUM**

| Tab | Document | Appx No. |
|-----|----------|----------|
| 1 | Final Written Decision in IPR2021-00593 | Appx1 – Appx41 |
| 2 | U.S. Patent No. 8,234,705 | Appx42 – Appx78 |

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

CISCO SYSTEMS, INC.,
FORESCOUT TECHNOLOGIES, INC., and
HEWLETT PACKARD ENTERPRISE COMPANY,
Petitioner,

v.

K.MIZRA LLC,
Patent Owner.
_____

IPR2021-00593[1]
Patent 8,234,705 B1
_____

Before MINN CHUNG, AARON W. MOORE, and IFTIKHAR AHMED,
*Administrative Patent Judges.*

CHUNG, *Administrative Patent Judge.*

JUDGMENT
Final Written Decision
Determining No Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

---

[1]  Forescout Technologies, Inc., which filed a petition in IPR2022-00081, and Hewlett Packard Enterprise Company, which filed a petition in IPR2022-00084, have been joined as a petitioner in this proceeding.

# I. INTRODUCTION

In this *inter partes* review ("IPR"), Cisco Systems, Inc., Forescout Technologies, Inc., and Hewlett Packard Enterprise Company (collectively "Petitioner") challenge the patentability of claims 1–3, 5–13, and 15–19 (the "challenged claims") of U.S. Patent No. 8,234,705 B1 (Ex. 1001, "the '705 patent"), owned by K.Mizra LLC ("Patent Owner"). This Final Written Decision is entered pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73. Based on the record before us, Petitioner has not shown, by a preponderance of the evidence, that claims 1–3, 5–13, and 15–19 of the '705 patent are unpatentable.

# II. BACKGROUND

## *A. Procedural History*

Cisco Systems, Inc. ("Cisco") filed a Petition (Paper 2, "Pet.") requesting an *inter partes* review of claims 1–3, 5–13, and 15–19 of the '705 patent. Patent Owner filed a Preliminary Response. Paper 8 ("Prelim. Resp.").

On September 24, 2021, applying the standard set forth in 35 U.S.C. § 314(a), which requires demonstration of a reasonable likelihood that a petitioner would prevail with respect to at least one challenged claim, we instituted an *inter partes* review of all challenged claims of the '705 patent based on the ground presented in the Petition. Paper 9 ("Inst. Dec."), 59.

After institution, Patent Owner filed a Patent Owner Response (Paper 23, "PO Resp."), Cisco filed a Reply to the Patent Owner Response (Paper 28, "Pet. Reply"), and Patent Owner filed a Sur-reply (Paper 34, "PO Sur-reply").

On October 22, 2021, Forescout Technologies, Inc. ("Forescout") filed a petition for *inter partes* review and a Motion for Joinder in IPR2022-00081, requesting that Forescout be joined as a petitioner in IPR2021-00593. *Forescout Technologies, Inc. v. K.Mizra LLC*, IPR2022-00081 ("'081 IPR"), Papers 1, 3 (PTAB Oct. 22, 2021). On the same day, Hewlett Packard Enterprise Company ("HPE") filed a petition for *inter partes* review and a Motion for Joinder in IPR2022-00084, requesting that HPE be joined as a petitioner in IPR2021-00593. *Hewlett Packard Enterprise Co. v. K.Mizra LLC*, IPR2022-00084 ("'084 IPR"), Papers 1, 3 (PTAB Oct. 22, 2021). Patent Owner did not file a Preliminary Response or an opposition to the Joinder Motions in '081 IPR and '084 IPR. Upon considering the information presented, we instituted trial in '081 IPR and '084 IPR, granted Forescout's and HPE's Motions for Joinder, and added each of Forescout and HPE as a petitioner to IPR2021-00593. '081 IPR, Paper 14; '084 IPR, Paper 10. A copy of each of these decisions was entered in this record. Papers 30, 31. These decisions were entered after Cisco filed the Reply, and no further substantive papers were filed by Cisco, Forescout, or HPE.

An oral hearing was held on June 16, 2022, and a copy of the hearing transcript has been entered into the record. Paper 39 ("Tr.").

### B. Related Matters

According to the parties, the '705 patent has been asserted in *K.Mizra LLC v. Cisco Systems, Inc.*, No. 6:20-cv-01031 (W.D. Tex.); *K.Mizra LLC v. Forescout Technologies, Inc.*, No. 2:21-cv-00248 (E.D. Tex.); *K.Mizra LLC v. Hewlett Packard Enterprise Co.*, No. 2:21-cv-00305 (E.D. Tex.); and *K.Mizra LLC v. Fortinet*, No. 2:21-cv-00249 (E.D. Tex.). Pet. 7–8; Paper 3, 1; '081 IPR Papers 1, 5; '084 IPR, Papers 1, 5.

*C. The '705 Patent*

The '705 patent issued July 31, 2012 from U.S. Patent Application
No. 11/237,003, filed September 27, 2005.  Ex. 1001, codes (21), (22), (45).

The '705 patent describes contagion isolation and inoculation in a
protected computer network.  *Id.* at code (57).  As background, the '705
patent describes as follows:

> Laptop and wireless computers and other mobile systems pose a
> threat to elements comprising and/or connected to a network
> service provider, enterprise, or other protected networks to which
> they reconnect after a period of connection to one or more
> networks and/or systems that are not part of the service provider,
> enterprise, or other protected network.  By roaming to unknown
> domains, such as the Internet, and/or connecting to such domains
> through public, wireless, and/or otherwise less secure access
> nodes, such mobile systems may become infected by computer
> viruses, worms, backdoors, and/or countless other threats and/or
> exploits and/or have unauthorized software installed . . . and/or
> have configurations, settings, security data, and/or other data
> added, removed, and/or changed in unauthorized ways and/or by
> unauthorized person.

*Id.* at 1:14–31.  The '705 patent describes that "[u]pon connecting to a
protected network, a system may infect or otherwise harm resources
associated with the protected network before measures can be taken to detect
and prevent the spread of such infections or harm."  *Id.* at 1:34–38.  The
'705 patent states that "[t]herefore, there is a need for a reliable way to
ensure that a system does not infect or otherwise harm other network
resources when connected to a protected network."  *Id.* at 1:38–41.

Against this backdrop, the '705 patent describes embodiments to
determine whether a host (e.g., a computer) should be quarantined when the
host attempts to connect to a protected network.  *Id.* at code (57).  If the host

is required to be quarantined, the host is provided only limited access to the protected network. *Id.* According to the '705 patent, in some embodiments, a quarantined host is permitted to access the protected network only to the extent necessary to remedy a condition that caused the quarantine to be imposed "such as to download a software patch, update, or definition; install, remove, and/or configure software and/or settings as required by a policy; and/or to have a scan or other diagnostic and/or remedial operation performed." *Id.* For example, a quarantined host is allowed to access a remediation server (e.g., to "download a patch, more current threat definition, etc.") but all other access requests are redirected to a quarantine server. *Id.* at 12:3–9.

Figure 10B of the '705 patent is reproduced below.



FIG. 10B

Figure 10B is a block diagram illustrating a network environment in which infected hosts and/or networks are quarantined. *Id.* at 2:14–16.

As shown in Figure 10B, hosts 1020 to 1024 connect via router 1026 and gateway 1028 to Internet 1030. *Id.* at 11:59–62. In an embodiment, gateway 1028 comprises a gateway, router, firewall, or other device configured to provide and control access between a protected network and the Internet and/or another public or private network. *Id.* at 11:63–67. In the event of quarantine of one or more of hosts 1020–1024, a quarantined host is permitted to access remediation server 1032 to download a patch, more current threat definition, etc. *Id.* at 12:1–7. Requests to connect to a host other than remediation server 1032 are redirected to quarantine server 1034 configured to provide a notice and/or other information and/or instructions to a user of the quarantined host. *Id.* at 12:8–11.

Figure 13 of the '705 patent is reproduced below.



**Figure 13**

Figure 13 is a flow diagram of an exemplary method for monitoring one or more computers for infestation. *Id.* at 2:21–23.

In the example shown in Figure 13, monitoring of a computer for infestation begins (step 1301) by retrieving a list of one or more addresses of computers, such as addresses of participating subscribers. *Id.* at 13:56–59. In the next step (step 1302), a computer associated with an address identified in a list is queried for a cleanliness assertion, e.g., by contacting a trusted computing base within a computer, and requesting an authenticated infestation scan by trusted software. *Id.* at 13:64–14:1. According to the '705 patent, an example of a trusted computing base is described in various Trusted Computing Group ("TCG") specifications, such as the TCG Architecture Overview. *Id.* at 14:4–7. Trusted code bases may execute antivirus scans of the remainder of the computer, including untrusted portions of the disk and/or operating system. *Id.* at 14:7–10. In addition, trusted code bases may digitally sign assertions about the cleanliness (e.g., infestation status) and/or state of their computers. *Id.* at 14:10–12. In some embodiments, the query for cleanliness may be responded to by anti-contagion software, such as antivirus software, with assertions about the currency of a scan, such as the last time a scan was performed. *Id.* at 14:12–16.

If a computer asserts it is clean (step 1303), then monitoring is complete (step 1305) in this example. *Id.* at 14:22–24. If, on the other hand, a cleanliness assertion is not provided (step 1303), then an infestation or vulnerability is presumed (step 1304). *Id.* at 14:24–25.

As discussed above, according to an embodiment of the '705 patent, a quarantined host is allowed to access a remediation server (e.g., to "download a patch, more current threat definition, etc.") but all other access requests are redirected to a quarantine server. *Id.* at 12:3–9. For example, a

device such as a router may forward outbound traffic from a quarantined computer to a quarantine server. *Id.* at 15:63–65.

If a received connection is a web server request, such as an HTTP request, then the server responds with a quarantine notification page. *Id.* at 15:66–16:2. An example of a quarantine notification page is a web page that provides notification that the computer is quarantined, and/or provides links to remediation sites appropriate to the quarantine, such as a link to a site that provides anti-contagion software for removing a virus that the quarantined computer is believed to contain. *Id.* at 16:2–7. The links on the quarantine notification page may be examples of HTTP addresses that are for use in remediation. *Id.* at 16:8–9.

If the request is a DNS inquiry, the inquiry is tested to see if it is a DNS request for a remediation host name, i.e., the host name corresponding to the IP address of the remediation host. *Id.* at 16:16–23. If the DNS inquiry was not for a remediation host name, then an IP address for a quarantine server is provided as a redirected IP address. *Id.* at 16:28–32. If the DNS inquiry was for a remediation host name, then the access request is permitted by providing the actual IP address of the remediation server or allowing the access through a proxy service and/or an external DNS service. *Id.* at 16:23–28.

### *D. Illustrative Claim*

Of the challenged claims, claims 1, 12, and 19 are independent. Claim 1 is illustrative of the challenged claims and is reproduced below with bracketing used by Petitioner.

1. A method for protecting a network, comprising:

[1.1] detecting an insecure condition on a first host that has connected or is attempting to connect to a protected network, wherein detecting the insecure condition includes [1.2] contacting a trusted computing base associated with a trusted platform module within the first host, [1.3] receiving a response, and [1.4] determining whether the response includes a valid digitally signed attestation of cleanliness, [1.5] wherein the valid digitally signed attestation of cleanliness includes at least one of an attestation that the trusted computing base has ascertained that the first host is not infested, and an attestation that the trusted computing base has ascertained the presence of a patch or a patch level associated with a software component on the first host;

[1.6] when it is determined that the response does not include a valid digitally signed attestation of cleanliness, quarantining the first host, including by preventing the first host from sending data to one or more other hosts associated with the protected network, wherein preventing the first host from sending data to one or more other hosts associated with the protected network includes [1.7] receiving a service request sent by the first host, [1.8] serving a quarantine notification page to the first host when the service request comprises a web server request, [1.9] and in the event the service request comprises a DNS query, providing in response an IP address of a quarantine server configured to serve the quarantine notification page if a host name that is the subject of the DNS query is not associated with a remediation host configured to provide data usable to remedy the insecure condition; and

[1.10] permitting the first host to communicate with the remediation host.

Ex. 1001, 19:57–20:22.

*E. Evidence*

*1. Applied References*

Petitioner relies upon the following references in its challenge to patentability.

| Reference | Date | Designation | Exhibit No. |
|---|---|---|---|
| U.S. Patent No. 9,436,820 B1 | Filed Aug. 2, 2004 | Gleichauf[2] | 1005 |
| U.S. Patent No. 7,747,862 B2 | Filed June 28, 2004 | Ovadia | 1006 |
| U.S. Patent No. 7,533,407 B2 | Filed Apr. 14, 2004 | Lewis | 1007 |

*2. Testimonial Evidence*

Petitioner supports its challenge with a Declaration from A. L. Narasimha Reddy, Ph.D. Ex. 1003 ("Reddy Declaration"). Patent Owner relies on a Declaration of Nenad Medvidovic, Ph.D., to support its Response. Ex. 2009 ("Medvidovic Declaration").

Dr. Reddy and Dr. Medvidovic were cross-examined during trial, and transcripts of Dr. Reddy's deposition (Ex. 2012) and Dr. Medvidovic's deposition (Ex. 1024) are included in the record.

---

[2] For clarity and ease of reference, we only list the first named inventor.

*F. Instituted Ground of Unpatentability*

Petitioner asserts the following ground of unpatentability (Pet. 17).

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 1–3, 5–13, 15–19 | 103(a)[3] | Gleichauf, Ovadia, Lewis |

III. ANALYSIS

*A. Relevant Principles of Law*

To prevail in challenging Patent Owner's claims, Petitioner must demonstrate by a preponderance of the evidence that the claims are unpatentable. 35 U.S.C. § 316(e); 37 C.F.R. § 42.1(d). "In an [*inter partes* review], the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable." *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016) (citing 35 U.S.C. § 312(a)(3) (requiring inter partes review petitions to identify "with particularity . . . the evidence that supports the grounds for the challenge to each claim")). This burden never shifts to Patent Owner. *See Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015) (citing *Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1326–27 (Fed. Cir. 2008)) (discussing the burden of proof in *inter partes* review).

A claim is unpatentable under 35 U.S.C. § 103(a) if the differences between the claimed subject matter and the prior art are such that the subject matter, as a whole, would have been obvious at the time the invention was

---

[3] The Leahy-Smith America Invents Act, Pub. L. No. 112-29, 125 Stat. 284 (2011), amended 35 U.S.C. § 103 effective March 16, 2013. Because the '705 patent has an effective filing date prior to the effective date of the applicable AIA amendment, we refer to the pre-AIA version of § 103.

made to a person having ordinary skill in the art to which the subject matter pertains. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations, including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) where in evidence, so-called secondary considerations.[4] *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

In addition, an invention "composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art." *KSR*, 550 U.S. at 418. Rather, "it can be important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does." *Id.* An obviousness determination "cannot be sustained by mere conclusory statements; instead, there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *Id.* (quoting *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006)); *see In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1380 (Fed. Cir. 2016).

We analyze Petitioner's asserted ground based on obviousness with the principles identified above in mind.

### B. Level of Ordinary Skill in the Art

We begin our analysis by addressing the level of ordinary skill in the art. Supported by the testimony of Dr. Reddy, Petitioner proposes that a

---

[4] The parties do not address secondary considerations, which therefore do not constitute part of our analysis.

person of ordinary skill in the art "would have had a bachelor's degree in computer science, computer engineering, electrical engineering, or an equivalent training, and approximately two years of professional experience in the field of network communications, and more specifically, network security." Pet. 10 (citing Ex. 1003 ¶ 18). Petitioner asserts that "[l]ack of professional experience can be remedied by additional education, and vice versa." *Id.* (citing Ex. 1003 ¶ 18).

Patent Owner does not dispute Petitioner's articulation of the level of ordinary skill in the art. *See generally* PO Resp. Dr. Medvidovic, Patent Owner's declarant, states that "[f]or the purposes of the subject IPR proceedings," he "employ[s]" the level of ordinary skill in the art articulated by Dr. Reddy. Ex. 2009 ¶ 26.

Based on the complete record, for purposes of this Decision, we adopt Petitioner's unopposed position as to the level of ordinary skill in the art at the time of the claimed invention because Petitioner's proposal is consistent with the level of ordinary skill in the art reflected by the prior art of record. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001).

### C. Claim Construction

In an *inter partes* review, we apply the same claim construction standard that would be used in a civil action under 35 U.S.C. § 282(b), following the standard articulated in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc). 37 C.F.R. § 42.100(b) (2020). In applying such standard, claim terms are generally given their ordinary and customary meaning, as would be understood by a person of ordinary skill in the art, at the time of the invention and in the context of the entire patent disclosure. *Phillips*, 415 F.3d at 1312–13. "In determining the meaning of the disputed

claim limitation, we look principally to the intrinsic evidence of record, examining the claim language itself, the written description, and the prosecution history, if in evidence." *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005, 1014 (Fed. Cir. 2006) (citing *Phillips*, 415 F.3d at 1312–17).

The parties discuss two claim terms recited in independent claims— "trusted computing base" and "trusted platform module." Pet. 11–16; PO Resp. 5–6. Petitioner contends the term "trusted computing base" should be construed to mean "a piece of hardware or software that has been designed to be part of a mechanism that provides security to a computer system" based on the statement made by the applicant during prosecution. Pet. 12– 13 (emphasis omitted). Patent Owner does not dispute Petitioner's proposed construction of this claim term. PO Resp. 5.

The parties dispute construction of "trusted platform module" (Pet. 13–16; PO Resp. 5–6) but do not identify any issue that would turn on the construction of this term. *See generally* Pet.; PO Resp.

Based on the complete record, for purposes of this Decision, we determine no claim terms require express construction. *See Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999) (holding that only terms that are in controversy need to be construed, and "only to the extent necessary to resolve the controversy"); *see also Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) (applying *Vivid Techs.* in the context of an *inter partes* review).

### D. Obviousness over Gleichauf, Ovadia, and Lewis

Petitioner contends that claims 1–3, 5–13, and 15–19 are unpatentable under § 103(a) over the combination of Gleichauf, Ovadia, and Lewis.

Pet. 18–67. Patent Owner disputes Petitioner's contentions. PO Resp. 1–3, 8–29; PO Sur-reply 1–16. For the reasons discussed below, we determine Petitioner does not show, by a preponderance of the evidence, the subject matter of claims 1–3, 5–13, and 15–19 would have been obvious over the combination of Gleichauf, Ovadia, and Lewis because Petitioner does not explain sufficiently why a person of ordinary skill in the art would have been motivated to combine Gleichauf, Ovadia, and Lewis in the manner proposed by Petitioner to arrive at the subject matter recited in the claims. Our analysis below focuses on the deficiencies in Petitioner's proffered reasons to combine Gleichauf and Lewis.

### 1. Overview of Gleichauf (Ex. 1005)

Gleichauf describes a system for controlling access to a network when a device attempts to connect to the network based on the "security posture" of the device. Ex. 1005, 3:7–9.

Figure 1 of Gleichauf is reproduced below.



Figure 1 illustrates an exemplary data communication system. *Id.* at 8:32–33.

As shown in Figure 1, data communication system 20 includes user device 22 and network 24, which includes network resources 25, data communications device 26, and policy server 28. *Id.* at 8:33–37. User device 22 may be a personal computer, a cellular telephone, a personal digital assistant ("PDA"), etc. *Id.* at 8:40–43.

Gleichauf describes the "security posture" of user device 22 as the device status relating to the user device's ability to resist reception or transmission of malware (e.g., viruses), content (spam and/or data theft), or access by unauthorized users. *Id.* at 8:52–56. Gleichauf also describes "posture credentials" as information associated with the "security posture" of a computing device. *Id.* at 3:30–32. According to Gleichauf, "posture

16

credentials" can include the status of anti-virus applications installed on user device 22, the status of intrusion prevention applications (e.g., firewalls) associated with the user device, and the version and the update patch level associated with the operating system running on the user device. *Id.* at 8:61–9:1.

In an exemplary operation of an embodiment, a computerized device, e.g., a personal computer, transmits an access request to the data communications device in an attempt to access the network resources within the network. *Id.* at 3:50–56. The data communications device that detects the presence of the new device initiates a challenge-response sequence by sending a challenge request to the computer device. *Id.* at 3:60–67. In response, the posture agent running on that computer device retrieves posture credentials describing the security posture of the computerized device and transmits an initial challenge response back to the data communications device, which forwards the challenge response onto the policy server. *Id.* at 3:60–4:3.

Based upon an analysis of the posture credentials returned by the computerized device, the policy server determines what type of admission policy and level of network access and privileges should be extended to the computer device. *Id.* at 4:15–19. Devices that are compliant with network admission policy would typically be given full network access. *Id.* at 4:19–21. Devices that are only mildly out of compliance may be simply issued a warning that they are in danger of falling out of compliance with corporate policy. *Id.* at 4:21–24. Devices that are more significantly out of compliance may be placed on an isolated, or "quarantine," network segment where they can be brought into compliance. *Id.* at 4:24–27. Devices that

violate core admission requirements may be denied network access entirely.
*Id.* at 4:27–28.

At the same time the policy server determines access, the policy
server can transmit one or more notification messages to the posture agent or
posture plug-ins running on the computer device attempting to gain access to
the network. *Id.* at 4:56–60. The notifications may include the results of the
posture check, remediation actions (if any) and an informational message to
be displayed to the user, or written to a local log file. *Id.* at 4:60–63.

In an embodiment, the notification message may contain text
messages for display to a user, including any remediation actions to be
performed. *Id.* at 21:1–5. For example, if a user device is non-compliant,
the message may be displayed to the user indicating that the device has been
quarantined and needs to be remediated. *Id.* at 21:6–8. The notification
message may also include a link to a remediation server or the IP address of
the remediation server. *Id.* at 21:8–10. If displayed to a user, the user may
click on the link or the IP address to be redirected to the remediation server.
*Id.* at 21:10–11.

The remediation server is configured to upgrade or provide up-to-date
patches to the operating system or applications, such as anti-virus
applications, associated with the computerized device. *Id.* at 5:8–11. If the
remediation process was successful, the device is admitted back to the
original network. *Id.* at 5:11–13.

### 2. *Overview of Ovadia (Ex. 1006)*

Ovadia describes methods and apparatuses to authenticate base and
subscriber stations and maintaining secure sessions for broadband wireless
networks. Ex. 1006, code (57), 3:62–64.

In an embodiment, Ovadia describes that a Trusted Computing Group (TCG) security scheme (promulgated by the TCG) is implemented to generate, store, and retrieve security-related data in a manner that facilitates privacy and security in broadband wireless networks. *Id.* at 4:16–21. Ovadia further describes that a TCG token comprising a trusted platform module (TPM) is employed. *Id.* at 4:22–24. According to Ovadia, TCG is a standards organization and an industry consortium concerned with platform and network security. *Id.* at 4:17–21, 4:31–32. Ovadia describes that "[t]he TCG main specification (Version 1.2, October, 2003—hereinafter referred to as the 'version 1.2 Specification') is a platform-independent industry specification that covers trust in computing platforms in general." *Id.* at 4:32–35.

Ovadia further describes that the TCG main specification defines a trusted platform sub system that employs cryptographic methods when establishing trust. *Id.* at 4:36–38. According to Ovadia, the trusted platform enables an authentication agent to determine the state of a platform environment and seal data particular to that platform environment. *Id.* at 4:40–43. Subsequently, authentication data (e.g., integrity metrics) stored in a TPM may be returned in response to an authentication challenge to authenticate the platform. *Id.* at 4:43–45.

In addition, Ovadia describes the details of Version 1.2-compliant TPM functions relating to security and privacy. *Id.* at 4:46–48. Figure 2 of Ovadia is reproduced below.



Figure 2 is a schematic diagram of a trusted platform module. *Id.* at 3:7–8.

Referencing Figure 2, Ovadia describes TPM's security functions, including security key generation, encryption, and hashing operations. *Id.* at 4:61–67. Ovadia also describes generating Attestation Identity Keys (AIKs) from the unique security key embedded in the TPM, which are used to digitally sign attestation of the integrity measurements. *Id.* at 5:31–38, 13:63–65.

### 3. Overview of Lewis (Ex. 1007)

Lewis relates to network access management and specifically to checking the security state of clients before allowing them access to network resources. Ex. 1007, 1:9–12.

Lewis describes a system for ensuring that machines having invalid or corrupt states are restricted from accessing network resources by providing a quarantine server located on a trusted machine in a network and a quarantine agent located on a client computer. *Id.* at 4:7–13. The quarantine agent

requests a bill of health (BoH) from the quarantine server, which responds with a manifest of checks that the client computer must perform. *Id.* at 4:13–16. The quarantine agent then sends a status report on the checks back to the quarantine server. *Id.* at 4:16–18. If the client computer is in a valid state, the BoH is issued to the client. *Id.* at 4:18–19. A valid state may be that all necessary patches are installed, or that necessary security software is installed. *Id.* at 4:19–21. If the client computer is in an invalid state, the client is directed to install the appropriate software/patches to achieve a valid state. *Id.* at 4:21–23.

Figure 4 of Lewis is reproduced below.



Figure 4 illustrates a quarantine server of Lewis. *Id.* at 4:52–53.

As shown in Figure 4, quarantine server (QS) 201[5] comprises Internet Information Server (IIS) 417 for proving a default web page, database engine 418, and hijack DNS component 421. *Id.* at 10:61–11:17. When a client is in quarantine and a user opens a web browser on the client computer, QS 201 provides a web page to inform the user that the client

---

[5] Although Figure 4 shows a quarantine server as QS 204, Lewis refers to the quarantine server as QS 201 in the textual description relating to Figure 4. *See* Ex. 1007, 10:61–11:17.

machine is in quarantine and corrective action must be taken. *Id.* at 10:63–66. QS 201 also includes a hijack DNS component 421 for intercepting DNS queries from quarantined clients. *Id.* at 11:15–17.

### 4. *Independent Claim 1*

Petitioner contends that the combination of Gleichauf, Ovadia, and Lewis teaches each of the recitations of claim 1. Pet. 29–54. In its proposed combination of Gleichauf, Ovadia, and Lewis, Petitioner relies on Gleichauf to teach most of the recitations of claim 1, except for (1) the limitations reciting "trusted platform module," for which Petitioner further relies on Ovadia, and (2) the limitations relating to the operation of the recited "quarantine server," for which Petitioner further relies on Lewis. *See id.* at 29–54. Petitioner also presents several reasons why a person of ordinary skill in the art would have combined Gleichauf, Ovadia, and Lewis in the manner proposed by Petitioner. *Id.* at 21–29.

Figure 1 of Gleichauf, as annotated by Petitioner, is reproduced below.



Ex.1005, Fig. 1 (annotated); Ex.1003, ¶ 142.

Pet. 50. Annotated Figure 1 above shows Petitioner's identification of the recited "first host," "trusted computing base," "remediation host," "protected network," and "one or more other hosts associated with the protected network" allegedly present in Gleichauf.

As indicated in Annotated Figure 1 above, in addressing the recitations of claim 1, Petitioner draws a correspondence between (1) the recited "first host" and Gleichauf's computerized device 22; (2) the recited "trusted computing base" and Gleichauf's posture agent 30; (3) the recited "remediation host" and Gleichauf's remediation server 66; (4) the recited "protected network" and Gleichauf's network 24 (*see* Pet. 30 (Petitioner identifies highlighted access request 40 and network 24 in Figure 1 as the

recited "attempt[] to connect to a protected network")); and (5) the recited "one or more other hosts associated with the protected network" and Gleichauf's network resources 25. In making these correspondences or mappings, Petitioner relies generally on Gleichauf's described functionality of detecting an access request by a computer device, initiating a challenge-response sequence by sending a challenge request to the computer device, the computer device's posture agent retrieving its posture credentials and transmitting a challenge response back, quarantining the computer device if the posture credentials do not indicate network policy compliance, and remediating the quarantined computer via communication with a remediation server. *Id.* at 29–33, 38–47, 50, 54.

Petitioner relies on Ovadia for its disclosure of "trusted platform module" described in the Trusted Computing Group's Trusted Platform Module Main Specification to teach the limitations reciting "trusted platform module." Pet. 33–35. Petitioner further relies on Lewis for its teachings regarding a quarantine server and the operation of the quarantine server to quarantine web requests and web traffic from the quarantined computer device. *Id.* at 47–53.

Claim 1 recites [1.1] "detecting an insecure condition on a first host that has connected or is attempting to connect to a protected network, wherein detecting the insecure condition includes," [1.2] "contacting a trusted computing base associated with a trusted platform module within the first host," [1.3] "receiving a response," and [1.4] "determining whether the response includes a valid digitally signed attestation of cleanliness." Ex. 1001, 19:58–65. Petitioner labels these recitations as limitations [1.1], [1.2], [1.3], and [1.4], as indicated in brackets above. Pet. 29, 32, 38, 39.

As discussed above, Petitioner maps the recited "first host" to Gleichauf's computerized device 22 and the recited "protected network" to Gleichauf's network 24. Pet. 30 (citing Ex. 1005, Fig. 1). Petitioner contends that Gleichauf teaches these limitations because Gleichauf describes a challenge-response sequence initiated by data communications device 26 when computerized device 22 (the claimed "first host") transmits an access request to the data communications device in an attempt to access the network resources within network 24 (i.e., "attempting to connect to a protected network," as claimed). *Id.* at 30–31 (citing Ex. 1005, 3:36–45, 3:50–56, 8:1–4; 11:29–32; 14:16–34; Ex. 1003 ¶ 77). Petitioner further asserts that Gleichauf teaches "detecting an insecure condition on a first host," as recited in claim 1, because in the challenge-response sequence the computerized device responds with its posture credentials, which the policy server analyzes to determine compliance with network admission policy. *Id.* at 31–32 (citing Ex. 1005, 1:10–14, 1:65–2:3, 3:36–45, 8:52–56, 8:65–9:1, 11:58–12:13, 14:16–34; 22:38–59, 31:1–7; Ex. 1003 ¶¶ 78–79, 81).

Claim 1 further recites

> [1.6] when it is determined that the response does not include a valid digitally signed attestation of cleanliness, quarantining the first host, including by preventing the first host from sending data to one or more other hosts associated with the protected network, wherein preventing the first host from sending data to one or more other hosts associated with the protected network includes
>> [1.7] receiving a service request sent by the first host,
>> [1.8] serving a quarantine notification page to the first host when the service request comprises a web server request,
>> [1.9] and in the event the service request comprises a DNS query, providing in response an IP address of a quarantine server configured to serve the quarantine notification page

> if a host name that is the subject of the DNS query is not
> associated with a remediation host configured to provide
> data usable to remedy the insecure condition.

Ex. 1001, 20:5–22.  Petitioner labels these recitations as limitations [1.6],

[1.7], [1.8], and [1.9], as indicated in brackets above.  Pet. 44, 46, 47, 49.

Petitioner contends that Gleichauf teaches limitations [1.6] and [1.7] and that

the combination of Gleichauf and Lewis teaches limitations [1.8] and [1.9].

*Id.* at 44–54.

Regarding limitation [1.6], "when it is determined that the response

does not include a valid digitally signed attestation of cleanliness,

quarantining the first host, including by preventing the first host from

sending data to one or more other hosts associated with the protected

network," Petitioner contends that Gleichauf teaches this limitation because

Gleichauf's policy server reviews and validates the digitally signed posture

credentials from a device and if the device is found to be out of compliance

with a network admission policy, places the device in quarantine.  Pet. 44–

45 (citing Ex. 1005, 4:24–27, 4:50–56, 7:3–8, 10:30–33, 11:45–60, 22:38–

42; Ex. 1003 ¶¶ 119–122).  Petitioner further argues that, in Gleichauf,

placement in quarantine causes the network (and more specifically, data

communication device 26 acting on directions from the policy server) to

"restrict or completely reject communications from the user device 22 to the

resources 25 within the network 24."  *Id.* at 45 (citing Ex. 1005, 11:58–67;

Ex. 1003 ¶ 123).

Addressing limitation [1.7], Petitioner asserts that Gleichauf teaches

"receiving a service request sent by the first host," as recited in claim 1,

because Gleichauf describes how the computerized device transmits an

"access request" or "signaling request" in an "attempt to access the network

26

resources within the network." Pet. 46 (citing Ex. 1005, 3:50–56, 8:1–4; Ex. 1003 ¶¶ 126–127). Petitioner argues that such a request to access network resources, which can occur even after the device has been placed in quarantine, is the recited "service request." *Id.* at 46–47 (citing Ex. 1005, 3:60–65, 13:52–65; Ex. 1003 ¶¶ 128–130).

Turning next to limitation [1.8], "serving a quarantine notification page to the first host when the service request comprises a web server request," Petitioner contends that Gleichauf teaches that "the service request comprises a web server request" because Gleichauf discloses "URL Redirect" and redirecting HTTP traffic from the user device to a remediation server. Pet. 47 (citing Ex. 1005, 15:45, 15:55–67). Citing the testimony of Dr. Reddy, Petitioner asserts that a person of ordinary skill in the art would have known that "HTTP traffic includes a *web server request* because hyper-text transfer protocol (HTTP) is the protocol used for communications between web browsers and web servers." *Id.* (citing Ex. 1003 ¶ 133). Petitioner further argues that a person of ordinary skill in the art would have been familiar with URL redirection as "a common technique used to forcibly provide an alternative response to a client's request for a webpage." *Id.* at 47–48 (citing Ex. 1015 ¶ 3; Ex. 1003 ¶ 134). Petitioner and Dr. Reddy cite a published U.S. patent application—U.S. Patent Application Publication 2005/0078668 A1 (Ex. 1015)—as evidence of how a person of ordinary skill in the art would have known URL redirection involves a request for a webpage. *Id.*; Ex. 1003 ¶ 134.

To teach "serving a quarantine notification page," Petitioner relies on the combination of Gleichauf's teaching of "notification messages" displayed to the user indicating that the device has been quarantined and

Lewis's teaching of a quarantine server providing a default webpage when a user opens a web browser from a client device that has been quarantined. Pet. 48 (citing Ex. 1005, 4:56–63, 21:1–12; Ex. 1007, 4:24–31, 13:7–12; Ex. 1003 ¶¶ 135–136). In the proposed combination, Petitioner further relies on Gleichauf's teaching of redirecting HTTP traffic from a quarantined device to a remediation server. *Id.* at 50 (explaining that in Gleichauf, "HTTP traffic from the [quarantined] device directed to the remediation server is permitted while HTTP traffic directed to other destinations is redirected [to the remediation server]" (citing Ex. 1005, 14:62–66, 15:55–67)). Petitioner asserts that "[i]n the combination, HTTP traffic from a quarantined device would be redirected to a quarantine server as taught by Lewis" and that "[t]he quarantine server would then serve a webpage to the user, as taught by Lewis." *Id.* at 49 (citing Ex. 1003 ¶ 137). In other words, in the proposed combination of Gleichauf and Lewis, Gleichauf would be modified such that HTTP traffic from a quarantined device would not be redirected to a remediation server but instead would be redirected to a quarantine server, which serves an informational webpage to the user of the device, as taught by Lewis. *Id.* at 48–49; Pet. Reply 14 (citing Ex. 1005, 4:56–63, 21:1–12; Ex. 1007, 4:24–31, 13:7–15; Pet. 48).

Addressing next limitation [1.9], "in the event the service request comprises a DNS query, providing in response an IP address of a quarantine server configured to serve the quarantine notification page if a host name that is the subject of the DNS query is not associated with a remediation host configured to provide data usable to remedy the insecure condition," Petitioner asserts that the combination of Gleichauf and Lewis teaches this limitation. Pet. 49–54.

In the proposed combination, Petitioner relies on Gleichauf's disclosure discussed above that "HTTP traffic from the [quarantined] device directed to the remediation server is permitted while HTTP traffic directed to other destinations is redirected [to the remediation server]" as teaching "serv[ing] the quarantine notification page if a host name that is the subject of the DNS query is not associated with a remediation host." Pet. 50 (citing Ex. 1005, 14:62–66, 15:55–67; Ex. 1003 ¶¶ 143–144). Petitioner further contends that Lewis teaches "providing in response an IP address of a quarantine server configured to serve the quarantine notification page" because Lewis describes the operation of "hijack DNS component 421 for intercepting DNS queries from quarantined clients" such that "[w]henever the client performs name resolution on any address, it will receive the IP [address] of QS [quarantine server]." *Id.* at 51 (citing Ex. 1007, 11:15–17, 14:22–23; Ex. 1003 ¶ 146). Petitioner argues that because Gleichauf describes that HTTP traffic from the [quarantined] device directed to the remediation server is permitted while HTTP traffic directed to other destinations, i.e., when the DNS query is not associated with a remediation host, is redirected (*id.* at 50), the combination of Gleichauf and Lewis teaches or suggests "responding to a DNS query with the IP address of a quarantine server if a host name that is the subject of the DNS query is not associated with a remediation host configured to provide data usable to remedy the insecure condition." *Id.* at 52–53 (emphasis omitted) (citing Ex. 1003 ¶ 148).

Addressing the motivation to combine, Petitioner presents several reasons why a person of ordinary skill in the art would have combined

Gleichauf and Lewis as proposed.[6] Pet. 26–29. Patent Owner asserts that a person of ordinary skill in the art would not have been motivated to modify Gleichauf to redirect traffic away from Gleichauf's remediation server to Lewis's quarantine server. PO Resp. 15–17. Patent Owner further argues that, although Petitioner discusses the benefits of a quarantine notification page generally, "Petitioner never explained why a quarantine notification page *hosted on a separate 'quarantine server'* . . . should be used to notify users of the need for remediation" when Gleichauf itself already provides the alleged benefits of the proposed combination. PO Sur-reply 9; *see also* Tr. 29:21–31:16 (Patent Owner argues Petitioner fails to explain why a person of ordinary skill in the art would have looked to Lewis to modify Gleichauf to implement a separate quarantine server). We agree with Patent Owner's argument. For the reasons explained below, we find that Petitioner does not explain sufficiently why a person of ordinary skill in the art would have looked to Lewis to modify Gleichauf, as proposed, when Gleichauf provides all of the Petitioner-identified benefits or advantages of the proposed combination of Gleichauf and Lewis.

---

[6] As discussed above, Petitioner relies on the combination of Gleichauf and Ovadia as teaching the limitations reciting "trusted platform module," whereas Petitioner relies on the combination of Gleichauf and Lewis as teaching the limitations relating to the operation of the recited "quarantine server." *See* Pet. 29–54. Because the subject matter of these two groups of limitations are relatively disjoint, Petitioner's proffered reasons to combine Gleichauf and Ovadia are largely unrelated to the reasons to combine Gleichauf and Lewis. *Compare* Pet. 21–26, *with id.* at 26–29. Thus, for limitations [1.8] and [1.9], for which Petitioner relies on the combination of Gleichauf and Lewis, we focus on Petitioner's proffered reasons to combine Gleichauf and Lewis.

First, Petitioner asserts that "[a person of ordinary skill in the art] would have known that serving a webpage with remediation instructions to a quarantined device from a quarantine server would *beneficially provide information to the user while simultaneously preventing the device from accessing protected network resources*." Pet. 27 (emphasis added) (citing Ex. 1007, 10:61–66, 13:63–14:1; Ex. 1003 ¶ 68).

As Petitioner acknowledges, however, Gleichauf itself already provides this benefit without the need for Lewis's quarantine server. For example, when addressing limitation [1.8], Petitioner acknowledges that Gleichauf discloses "notification messages" displayed to the user indicating that the device has been quarantined. Pet. 48 ("Gleichauf describes providing 'one or more *notification messages*' for display to a user 'indicating that the device has been quarantined.'" (emphasis added) (citing Ex. 1005, 4:56–63, 21:1–12)). In the cited portion of Gleichauf, Gleichauf describes that

> [t]he notification message may contain a text message for display to a user or for logging to a log file (e.g., *messages to display to the user* or a log or *URL's of the remediation server* 66 and *any remediation actions to be performed*). For example, in the case that a user device 22 is non-compliant, *the message may be displayed to the user* or written to a log file *indicating that the device has been quarantined and needs to be remediated*.

Ex. 1005, 21:1–8 (emphases added). Petitioner also concedes, when addressing limitation [1.6], Gleichauf discloses that placing a user device in quarantine causes the network (and more specifically, data communication device 26 acting on directions from the policy server) to "restrict or completely reject communications from the user device 22 to the resources 25 within the network 24." Pet. 45 (citing Ex. 1005, 11:58–67; Ex. 1003

¶ 123). Thus, Petitioner admits that Gleichauf alone, without the need for Lewis's quarantine server, provides the Petitioner-identified benefit of "provid[ing] [quarantine] information to the user while simultaneously preventing the device from accessing protected network resources." *See id.* at 27, 45, 48.

Next, Petitioner asserts, citing the testimony of its declarant, Dr. Reddy, that "Lewis's quarantine webpage would also be advantageous to Gleichauf's . . . notification message" because "[t]he webpage served by the quarantine server would be displayed in the browser that the user already has opened, which would advantageously *avoid necessitating additional software components* running on the device to receive and display the notification message to the user." Pet. 27–28 (emphasis added) (citing Ex. 1005, 4:56–60; Ex. 1006, 16:62–65; Ex. 1003 ¶ 68); *see also id.* at 48 (citing Ex. 1005, 4:56–63, 21:1–12).

Gleichauf's notification messages, however, provide the same benefit without the need for Lewis's quarantine webpage because Gleichauf discloses that the notification messages are generated in an "*application-independent*" form, such as the XML (extensible markup language) format. *See* Ex. 1005, 20:55–60 (emphasis added) (describing notification messages in the same embodiment cited by Petitioner). Thus, Gleichauf indicates that the notification messages may be displayed on a browser using XML pages, without the need for additional software running on the device to receive and display the notification message to the user. *See also* Tr. 43:7–15 (Patent Owner argues that even if Gleichauf only teaches "messages," a person of ordinary skill in the art could implement a webpage as part of the notification). Neither Petitioner nor Dr. Reddy addresses this disclosure in

Gleichauf or explains why a person of ordinary skill would have looked to Lewis to obtain the alleged benefit or advantage when Gleichauf already provides the same benefit or advantage.

Petitioner next asserts that "[s]erving a webpage from a quarantine server would also provide the quarantined device's user the option to proceed with the remediation or terminate the connection attempt" because in the proposed combination, "the webpage would direct the user to a remediation server that can resolve the security issues" and, in the event "[a] user that does not have the time to remediate security issues (e.g., a user attempting access from an airport terminal)," the user "may opt to terminate the connection attempt." Pet. 28 (citing Ex. 1003 ¶ 69). Petitioner contends that "[a person of ordinary skill in the art] would have understood the benefits of giving the user the option to choose their desired course of action." *Id.* (citing Ex. 1003 ¶ 69). During the oral hearing, Petitioner elaborated on this rationale in a question and answer exchange with the panel as follows.

> JUDGE AHMED: Counsel, let me follow up on that. I know you said the patent owner raised this argument in the surreply, but I'm still having a little bit of difficulty following the need for a separate quarantine server when the remediation server itself could have hosted the quarantine webpage, right?
>
> Can you point me to what petitioner's basis is for that, why a person of skill in the art would be motivated to separate this functionality out on a separate server?
>
> MR. GORYUNOV:
> . . .
>
> The combination of Gleichauf with Lewis would then redirect the HTTP request from the web server to this quarantine webpage hosted by a quarantine server, which would provide all this information to the user, remind them that the device is in quarantine, remind them of what remedial actions must be taken,

and provide *a link to the remediation server* that *they can click on* and remediate.

This goes to one of the reasons, Your Honor, for the -- *reason for the combination*, *to give the user a choice*. If I may, K. Mizra says if you're at the remediation server, you expect your device to be remediated every single time. Well, if a user is in the airport and, you know, I have ten minutes before I'm boarding my flight, I may not have time to download the latest Windows patch which can be multiple hundreds of megabytes and you need time to install that.

So I have the option at that point of terminating the connection and resuming it at a later time.

Tr. 17:1–18:11 (emphases added). In other words, according to Petitioner, one of the benefits of the proposed combination of Gleichauf and Lewis is giving the user a choice or option of remediating now or later.

Petitioner, however, concedes that Gleichauf alone provides the same benefit because Petitioner acknowledges that Gleichauf "gives the user a choice: remediate now or later." Pet. Reply 15 (citing Ex. 1005, 23:65–24:2 as disclosing "a user 'may' click on a link to a remediation server"). In the cited portion, Gleichauf describes that "[t]he notification message may also include *a link to a remediation server* or the IP address of the remediation server [ ] that *a user may click on*." Ex. 1005, 23:65–67 (emphases added). Thus, Gleichauf alone, without the need for Lewis's quarantine server, provides the benefit or advantage of giving the user a choice or option of remediating now or later by displaying a notification message to the user that includes a link to a remediation server that the user may or may not click on to remediate now or later.

Therefore, we find that Gleichauf alone provides all of the alleged benefits or advantages of the proposed combination of Gleichauf and Lewis identified by Petitioner.

34

As discussed above, in the proposed combination of Gleichauf and Lewis, Gleichauf would be modified such that HTTP traffic from a quarantined device would not be redirected to a remediation server but instead would be redirected to a quarantine server, which serves an informational webpage to the user of the device, as taught by Lewis. Pet. 48–49; Pet. Reply 14 (citing Ex. 1005, 4:56–63, 21:1–12; Ex. 1007, 4:24–31, 13:7–15; Pet. 48). Thus, Petitioner's proposed combination contemplates (1) modifying Gleichauf's network by adding a separate quarantine server, (2) modifying Gleichauf's policy server to not redirect HTTP traffic from a quarantined device to a remediation server and to instead redirect the HTTP traffic to the quarantine server, and (3) providing a quarantine notice webpage to the user from the quarantine server, including a link to the remediation server, which the user can click on to access the remediation server. In addition, Gleichauf's policy server would also need to be modified to not provide the notification messages to the user for HTTP traffic to avoid having both the policy server and the quarantine server provide the same or similar information displays to the user.

Neither Petitioner nor Dr. Reddy explains adequately why a person of ordinary skill in the art would have been motivated to look to Lewis to introduce such significant changes to the architecture or design of Gleichauf's network when Gleichauf alone already provides all of the alleged benefits or advantages of the proposed combination identified by Petitioner. *See* Pet. 26–29; Pet. Reply 14–16; Ex. 1003 ¶¶ 66–71. Thus, based on the complete record, we find that the alleged benefits or advantages of the proposed combination identified by Petitioner do not provide sufficient basis for establishing why a person of ordinary skill in the art

would have been motivated to combine Gleichauf and Lewis in the manner proposed by Petitioner. *See In re Anova Hearing Labs, Inc.*, 809 F. App'x 840, 843 (Fed. Cir. 2020) (finding that the Board's general statements that a person of ordinary skill in the art would have combined the prior art references to address the problem of occlusion effect in hearing aids was insufficient when the Board does not explain why a person of ordinary skill in the art would have been "motivated to modify Brown, which already includes vents, to address occlusion effect") (non-precedential); *cf. Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1369 (Fed. Cir. 2012) ("Because each device independently operates effectively, a person having ordinary skill in the art, who was merely seeking to create a better device to drain fluids from a wound, would have no reason to combine the features of both devices into a single device.").

Dr. Reddy additionally testifies that "URL redirection is a well-known concept in HTTP traffic" (Ex. 1003 ¶ 24) and that "[a person of ordinary skill in the art] would have been familiar with URL redirection, which was a common technique used to forcibly provide an alternative response to a client's request for a web page" (*id.* at ¶ 134). During the oral hearing, Petitioner also stated, citing the Reddy Declaration, that "it was well known to redirect traffic to a separate server." Tr. 17:8–12 (citing Ex. 1003 ¶ 134).

This, however, does not provide a sufficient explanation why a person of ordinary skill in the art would have been motivated to combine Gleichauf and Lewis. This rationale and all of the other reasons for the proposed combination proffered by Petitioner establish, at most, that Gleichauf and Lewis *could* have been combined to meet limitations [1.8] and [1.9], rather than a person of ordinary skill in the art *would have been* motivated to make

the proposed combination. This is insufficient. *See Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1073 (Fed. Cir. 2015) ("obviousness concerns whether a skilled artisan not only *could have made* but *would have been motivated to make* the combinations or modifications of prior art to arrive at the claimed invention") (citing *InTouch Techs., Inc. v. VGO Commc'ns, Inc.*, 751 F.3d 1327, 1352 (Fed. Cir. 2014)). We find, therefore, that Petitioner does not provide a sufficient reasoning to support obviousness of claim 1 based on the proposed combination.[7] *See Kinetic Concepts*, 688 F.3d at 1366–67 (holding that "some kind of motivation must be shown from some source, so that the [trier of fact] can understand why a person of ordinary skill would have thought of either combining two or more references or modifying one to achieve the patented [invention]")); *InTouch Techs.*, 751 F.3d at 1348–49 (Fed. Cir. 2014) ("[The expert witness's] testimony was nothing more than impermissible hindsight; she opined that all of the elements of the claims disparately existed in the prior art, but failed to provide the glue to combine these references.").

Accordingly, based on the complete record, we determine that Petitioner does not demonstrate, by a preponderance of the evidence, that the

---

[7] We note that Gleichauf alone or the combination of Gleichauf and Ovadia does not render claim 1 obvious because Gleichauf alone or the combination of Gleichauf and Ovadia does not satisfy the limitation "providing . . . an IP address of a quarantine server configured to serve the quarantine notification page," as recited in limitation [1.9]. Thus, to show obviousness of claim 1 over the combination of Gleichauf, Ovadia, and Lewis, Petitioner must identify "some articulated reasoning with some rational underpinning" why a person of ordinary skill in the art would have combined Gleichauf and Lewis to arrive at the subject matter recited in limitations [1.8] and [1.9]. *See KSR*, 550 U.S. at 418.

subject matter of claim 1 would have been obvious over the combination of Gleichauf, Ovadia, and Lewis.

### 5. Independent Claims 12 and 19

For independent claims 12 and 19, Petitioner asserts that all of the steps or functions recited in the claims are "substantively identical to the steps of claim 1 and are rendered obvious for the same reasons." Pet. 65, 67. For claims 12 and 19, Petitioner does not provide any additional reasons why a person of ordinary skill in the art would have been motivated to combine Gleichauf and Lewis beyond those discussed above with respect to claim 1. *See* Pet. 65–67. Therefore, for the same reasons discussed above with respect to claim 1, we find Petitioner does not provide a sufficient reasoning to support obviousness of claims 12 and 19 based on the proposed combination of Gleichauf, Ovadia, and Lewis.

Accordingly, based on the complete record, we determine that Petitioner does not demonstrate, by a preponderance of the evidence, that the subject matter of claims 12 and 19 would have been obvious over the combination of Gleichauf, Ovadia, and Lewis.

### 6. Dependent Claims 2, 3, 5–11, 13, and 15–18

Claims 2, 3, 5–11, 13, and 15–18 depend directly or indirectly from claims 1 or 12. Petitioner's arguments and evidence presented with respect to these dependent claims do not remedy the deficiencies in Petitioner's analysis of independent claim 1 discussed above. Therefore, for the same reasons discussed above with respect to claim 1, Petitioner has not shown by a preponderance of the evidence that claims 2, 3, 5–11, 13, and 15–18 are

unpatentable under 35 U.S.C. § 103(a) over the combination of Gleichauf, Ovadia, and Lewis.

## IV. CONCLUSION

The table below summarizes our conclusions as to the challenged claims.

| Claims | 35 U.S.C. § | References/Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1–3, 5–13, 15–19 | 103(a) | Gleichauf, Ovadia, Lewis | | 1–3, 5–13, 15–19 |

## V. ORDER

In consideration of the foregoing, it is

ORDERED that claims 1–3, 5–13, and 15–19 of U.S. Patent No. 8,234,705 B1 have not been shown, by a preponderance of the evidence, to be unpatentable; and

FURTHER ORDERED that, because this is a Final Written Decision, a party to the proceeding seeking judicial review of the Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

For PETITIONER:

Theodore M. Foster
David L. McCombs
Eugene Goryunov
Gregory P. Huh
HAYNES AND BOONE LLP
ipr.theo.foster@haynesboone.com
david.mccombs.ipr@haynesboone.com
eugene.goryunov.ipr@haynesboone.com
gregory.huh.ipr@haynesboone.com


Louis Campbell
Matthew McCullough
Kimball Anderson
WINSTON & STRAWN LLP
llcampbell@winston.com
mrmccullough@winston.com
kanderson@winston.com


Manish Mehta
Davis Chin
Kal K. Shah
Samuel Ruggio
BENESCH FRIEDLANDER COPLAN & ARONOFF LLP
mmehta@beneschlaw.com
dchin@beneschlaw.com
kshah@beneschlaw.com
sruggio@beneschlaw.com

For PATENT OWNER:

Sang Hui Kim
David Schumann
Palani Rathinasamy
Moses Xie
Cliff Win
FOLIO LAW GROUP PLLC
michael.kim@foliolaw.com
david.schumann@foliolaw.com
palani@foliolaw.com
moses.xie@foliolaw.com
cliff.win@foliolaw.com



US008234705B1

(54) **CONTAGION ISOLATION AND INOCULATION**

(75) Inventors: **James A. Roskind**, Redwood City, CA (US); **Aaron T. Emigh**, Incline Village, NV (US)

(73) Assignee: **Radix Holdings, LLC**, Incline Village, NV (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1520 days.

(21) Appl. No.: **11/237,003**

(22) Filed: **Sep. 27, 2005**

**Related U.S. Application Data**

(60) Provisional application No. 60/613,909, filed on Sep. 27, 2004.

(51) **Int. Cl.**
|  |  |
|---|---|
| *G06F 11/00* | (2006.01) |
| *G06F 12/14* | (2006.01) |
| *G06F 12/16* | (2006.01) |
| *G08B 23/00* | (2006.01) |

(52) **U.S. Cl.** ................ **726/22**; 726/23; 726/24; 726/25
(58) **Field of Classification Search** .................... 726/11, 726/14, 22–25
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| 6,823,479 B1 * | 11/2004 | McElhaney et al. ............ 714/43 |
|---|---|---|
| 6,996,845 B1 * | 2/2006 | Hurst et al. ..................... 726/25 |
| 7,263,720 B2 * | 8/2007 | Silvester ........................ 726/22 |
| 7,287,278 B2 * | 10/2007 | Liang ............................. 726/22 |
| 7,424,610 B2 * | 9/2008 | Ranganathan ................ 713/164 |
| 2002/0083328 A1 * | 6/2002 | Riordan ........................ 713/183 |
| 2003/0188173 A1 * | 10/2003 | Zimmer et al. ............... 713/189 |

| 2003/0188194 A1 * | 10/2003 | Currie et al. .................. 713/201 |
|---|---|---|
| 2005/0018618 A1 * | 1/2005 | Mualem et al. ............... 370/252 |
| 2005/0033987 A1 * | 2/2005 | Yan et al. ...................... 713/201 |
| 2005/0131997 A1 * | 6/2005 | Lewis et al. ................... 709/203 |
| 2006/0053426 A1 * | 3/2006 | Dive-Reclus et al. ........ 719/328 |

OTHER PUBLICATIONS

Bohra, A.; Neamtiu, I; Gallard, P.; Sultan, F.; Iftode, L.; Remote repair of operating system state using Backdoors; Autonomic Computing, 2004. Proceedings. International Conference on May 17-18, 2004 pp. 256-263.*
Mark V. Glover, Integrating a Trusted Computing Base Extension Server and Secure Session Server into the LINUX Operating System, Sep. 2001, Naval Postgraduate School.*
Pearson et al., Trusted Computing Platform: TCPA Technology in Context, 2003, Hewlett-Packard Books: Patricia Pekary.*
OLS: Linux and trusted computing, Jul. 22, 2005, http://lwn.net/Articles/144681/ (as lined on Jul. 15, 2010).*

* cited by examiner

*Primary Examiner* — Eleni Shiferaw
*Assistant Examiner* — Jing Sims

(57) **ABSTRACT**

Contagion isolation and inoculation is disclosed. In some embodiments, a request is received from a host, e.g., via a network interface, to connect to a protected network. It is determined whether the host is required to be quarantined. If the host is required to be quarantined, the host is provided only limited access to the protected network. In some embodiments, a quarantined host is permitted to access the protected network only as required to remedy a condition that caused the quarantine to be imposed, such as to download a software patch, update, or definition; install, remove, and/or configure software and/or settings as required by a policy; and/or to have a scan or other diagnostic and/or remedial operation performed. In various embodiments attempts to communicate with hosts not involved in remediation are redirected to a quarantine system, such as a server, that provides information, notices, updates, and/or instructions to the user.

**19 Claims, 25 Drawing Sheets**



**Appx42**　Ex.1001



101 — Network traffic stats monitored

102 — Evaluate recent activity

103 — Anomalous?

N → 104 — Do nothing

Y

105 — Reduce time until next check for updates

**Figure 1**



201 — Time to check for updates

202 — Retrieve old version identifier

203 — Request update from source

204 — Schedule next time to check for updates

**Figure 2A**

Ex.1001
CISCO SYSTEMS, INC. / Page 3 of 37



FIG. 2B



**Figure 3A**

Ex.1001
CISCO SYSTEMS, INC. / Page 5 of 37



FIG. 3B



FIG. 3C



FIG. 3D

Ex.1001
CISCO SYSTEMS, INC. / Page 6 of 37



**Figure 4A**



FIG. 4B

Ex.1001
CISCO SYSTEMS, INC. / Page 8 of 37



FIG. 4C



**Figure 5**



**Figure 6**

Ex.1001
CISCO SYSTEMS, INC. / Page 11 of 37



**Figure 7**



801 — Obtain list of indirect sources for acquiring content

Retrieve next address and authenticator — 802

Contact address and request content — 803

804 — Acquisition complete?

805 — Done

N

806 — More sources in list?

Y

N

807 — Acquisition from source(s) unsuccessful

**Figure 8**

**Appx54**                    Ex.1001
CISCO SYSTEMS, INC. / Page 13 of 37



**Figure 9**

Ex.1001
CISCO SYSTEMS, INC. / Page 14 of 37



1001 — Detect vulnerability in, or contagion on, computer

1002 — Quarantine vulnerability or infestation

1003 — Provide remediation access

**Figure 10A**



FIG. 10B

Ex.1001
CISCO SYSTEMS, INC. / Page 16 of 37



**Figure 11**



**Figure 12**

Ex.1001
CISCO SYSTEMS, INC. / Page 18 of 37



**Figure 13**



**Figure 14**



1501 — Decision made to quarantine system

1502 — Detect inbound traffic to system

1503 — Remediation related?

1504 — Forward traffic

Y

N

1507 — Discard or respond "unreachable"

**Figure 15**

Ex.1001
CISCO SYSTEMS, INC. / Page 21 of 37



**Figure 16**



1701 — Prepare to scan system for backdoor inoculation paths

1702 — Scan to detect any open TCP/IP backdoor ports

1703 — Any open backdoors?

N

1704 — Test open backdoors for usability

1705 — Usable backdoors detected?

1706 — Done

N

Y

1707 — Inoculate via backdoor

**Figure 17**



**Figure 18**



**Figure 19A**



FIG. 19B

Ex.1001
CISCO SYSTEMS, INC. / Page 26 of 37

# CONTAGION ISOLATION AND INOCULATION

## CROSS REFERENCE TO OTHER APPLICATIONS

This application claims priority to U.S. Provisional Patent Application No. 60/613,909 entitled CONTAGION ISOLATION AND INOCULATION filed Sep. 27, 2004, which is incorporated herein by reference for all purposes.

## BACKGROUND OF THE INVENTION

Laptop and wireless computers and other mobile systems pose a threat to elements comprising and/or connected to a network service provider, enterprise, or other protected networks to which they reconnect after a period of connection to one or more networks and/or systems that are not part of the service provider, enterprise, or other protected network. By roaming to unknown domains, such as the Internet, and/or connecting to such domains through public, wireless, and/or otherwise less secure access nodes, such mobile systems may become infected by computer viruses, worms, backdoors, and/or countless other threats and/or exploits and/or have unauthorized software installed; have software installed on the mobile system by an operator of the protected network for the protection of the mobile system and/or the protected network removed or altered without authorization; and/or have configurations, settings, security data, and/or other data added, removed, and/or changed in unauthorized ways and/or by unauthorized person. Similarly, a stationary system may become infected, e.g., due to receipt and execution of malicious code via a network or other communication and/or a diskette and/or other removable media. Upon connecting to a protected network, a system may infect or otherwise harm resources associated with the protected network before measures can be taken to detect and prevent the spread of such infections or harm. Therefore, there is a need for a reliable way to ensure that a system does not infect or otherwise harm other network resources when connected to a protected network.

## BRIEF DESCRIPTION OF THE DRAWINGS

Various embodiments of the invention are disclosed in the following detailed description and the accompanying drawings.

FIG. **1** is a flow diagram of a method for reducing an anti-contagion update interval during periods of suspicious network activity according to some embodiments.

FIG. **2A** is a flow diagram of a method for cooperatively scheduling an anti-contagion update interval according to some embodiments.

FIG. **2B** is a block diagram of a network environment in which anti-contagion updates are distributed according to some embodiments.

FIG. **3A** is a flow diagram of a method for contacting an anti-contagion source and optionally getting an update according to some embodiments.

FIGS. **3B-3D** illustrate distributed update distribution as implemented according to some embodiments.

FIG. **4A** is a flow diagram of a method for acquiring an update according to some embodiments.

FIG. **4B** is a block diagram of a client system configured to obtain an update according to some embodiments.

FIG. **4C** is a block diagram of a system used to distribute an update according to some embodiments.

FIG. **5** is a flow diagram of a method for distributing updates according to some embodiments.

FIG. **6** is a flow diagram of a method for establishing a redistribution policy according to some embodiments.

FIG. **7** is a flow diagram of a method for redistributing content such as updates according to some embodiments.

FIG. **8** is a flow diagram of a method for using peers or other indirect data sources to acquire content such as updates according to some embodiments.

FIG. **9** is a flow diagram of a method for redistributing content such as updates according to some embodiments.

FIG. **10A** is a flow diagram of a method for identifying and remedying problems according to some embodiments.

FIG. **10B** is a block diagram illustrating a network environment in which infected hosts and/or networks are quarantined according to some embodiments.

FIG. **11** is a flow diagram of a method for identifying vulnerabilities according to some embodiments.

FIG. **12** is a flow diagram of a method for identifying an infestation according to some embodiments.

FIG. **13** is a flow diagram of a method for monitoring one or more computers for infestation according to some embodiments.

FIG. **14** is a flow diagram of a method for quarantining a computer according to some embodiments.

FIG. **15** is a flow diagram of a method for quarantining a computer according to some embodiments.

FIG. **16** is a flow diagram of a method for a quarantine server to respond to requests according to some embodiments.

FIG. **17** is a flow diagram of a method for scanning backdoors and inoculating according to some embodiments.

FIG. **18** is a flow diagram of a method for categorizing messages according to some embodiments.

FIG. **19A** is a flow diagram of a method for notifying possible sources of infection according to some embodiments.

FIG. **19B** is a block diagram illustrating a network environment in which suspicious messages are identified and/or one or more notifications are sent when a malicious message is detected.

## DETAILED DESCRIPTION

The invention can be implemented in numerous ways, including as a process, an apparatus, a system, a composition of matter, a computer readable medium such as a computer readable storage medium or a computer network wherein program instructions are sent over optical or electronic communication links. In this specification, these implementations, or any other form that the invention may take, may be referred to as techniques. A component such as a processor or a memory described as being configured to perform a task includes both a general component that is temporarily configured to perform the task at a given time and a specific component that is manufactured to perform the task. In general, the order of the steps of disclosed processes may be altered within the scope of the invention.

A detailed description of one or more embodiments of the invention is provided below along with accompanying figures that illustrate the principles of the invention. The invention is described in connection with such embodiments, but the invention is not limited to any embodiment. The scope of the invention is limited only by the claims and the invention encompasses numerous alternatives, modifications and equivalents. Numerous specific details are set forth in the following description in order to provide a thorough under-

Ex.1001
CISCO SYSTEMS, INC. / Page 27 of 37

standing of the invention. These details are provided for the purpose of example and the invention may be practiced according to the claims without some or all of these specific details. For the purpose of clarity, technical material that is known in the technical fields related to the invention has not been described in detail so that the invention is not unnecessarily obscured.

Contagion isolation and inoculation is disclosed. In some embodiments, a request is received from a host, e.g., via a network interface, to connect to a protected network. It is determined whether the host is required to be quarantined. If the host is required to be quarantined, the host is provided only limited access to the protected network. In some embodiments, a quarantined host is permitted to access the protected network only as required to remedy a condition that caused the quarantine to be imposed, such as to download a software patch, update, or definition; install, remove, and/or configure software and/or settings as required by a policy; and/or to have a scan or other diagnostic and/or remedial operation performed. In various embodiments attempts to communicate with hosts not involved in remediation are redirected to a quarantine system, such as a server, that provides information, notices, updates, and/or instructions to the user.

Contagion refers herein to software programs and/or code, data values, configurations, and settings, that expose a computer or other system to security threats, such as unauthorized access and/or use of the system and/or data stored thereon; corruption or loss of data; and/or damage, loss, and/or unauthorized reconfiguration of system software and/or hardware components. Examples of contagion include software programs and/or code designed to perform undesirable and/or unauthorized actions from the perspective of the (authorized) user of a computer, and at the same time perform desired actions from the perspective of the creator or controller of such contagion. Examples of contagion include computer worms, viruses, and Trojan horses. Anti-contagion software refers herein to software that prevents, impedes or remediates contagion, such as Norton Antivirus from Symantec, or VirusScan from McAfee, which identifies and/or removes contagion from a user's computer. Another example of anti-contagion software is software that repairs a security vulnerability through which contagion may spread. Many anti-contagion methods rely on contagion descriptions, such as virus signatures, to identify the contagion, and must be updated regularly to be effective.

FIG. 1 is a flow diagram of a method for reducing an anti-contagion update interval during periods of suspicious network activity according to some embodiments. An update interval refers herein to a period of time between acquisition of updates, such as security updates, virus signature file updates, or virus scanner updates. In this example, network traffic statistics may be monitored (101). An example of traffic statistics is latency experienced by email, such as average latency, or median latency. Another example of traffic statistics is the rate of unacceptable attempted TCP/IP traffic, such as attempts to connect to blocked or restricted ports, or insufficiently authenticated (or authorized) connections to ports, or connections that provided invalid or illegal content such as extraordinarily long strings, or specific content detected to be malicious. Recent activity may be evaluated (102) to see if it is anomalous. Examples of anomalous activity include median email latency in mail queues beyond some threshold, for example above a 4 hour median queuing delay, and rates of unacceptable attempted TCP/IP traffic beyond some threshold, for example greater than two attempts per minutes over a one hour period. Another example of a threshold for anomalous activity is a comparison with recent historical

statistics, such as unacceptable attempted TCP/IP traffic at a rate greater than ten times the expected rate over a 30 minute period. The expected rate may for example be an average over a recent historic period, such as an average rate over the last week of connectivity. If activity is not deemed anomalous (103), then in this example, processing continues with no change (104) in the next update interval. If the activity is deemed anomalous (103), then in this example, the next update interval is reduced, for example reduced to some proportion of the planned update interval, for example reduced to 25% of the previous or default update interval. Another example of reducing the next update interval is to reduce the currently remaining time until an update, for example reducing by a proportion, such as 50%, the remaining time until an update is requested.

FIG. 2A is a flow diagram of a method for cooperatively scheduling an anti-contagion update interval according to some embodiments. In this example, the planned time for contacting an anti-contagion source may arrive (201). An old version identifier may be retrieved (202), such as a checksum or hash for a file, or a version number for software stored in a file system or registry, or a version number for an anti-virus signature file stored in a file system or registry. An update may be requested from an anti-contagion source (203), for example as is discussed in conjunction with FIG. 3A, which may include updating or concluding that an update is not needed. A time for next contacting an anti-contagion source is decided upon (204). In some embodiments, the scheduled time may be made sooner when the source of the update, such as a vendor of software to which the update pertains, anticipates the impending release of a fully tested update, such as scheduling a next contact time in a few hours, or a few days. If the current computer's version of anti-contagion software contains resolutions to all known problems and otherwise anomalous traffic patterns then, in this example, the update interval may be made longer, such as the full default interval for a computer, for example one week. In some embodiments, the selection of the next update interval may be dependent on the specific product. For example, a "pro version" may have a short default interval, such as one day, and a "home version" may have a relatively long default interval, such as two weeks or one month.

FIG. 2B is a block diagram of a network environment in which anti-contagion updates are distributed according to some embodiments. A plurality of clients 1 to "n", represented in FIG. 2B by clients 220, 222, and 224, are connected to the Internet 226. An update server 228 also is connected to the Internet 226. In various embodiments, one or more of the clients 220-224 is configured to request and obtain updates, if any, from update server 228 via the Internet, e.g., as described above in connection with FIG. 2A.

FIG. 3A is a flow diagram of a method for contacting an anti-contagion source and optionally getting an update according to some embodiments. In this example, an old version identifier may be retrieved (301), for example as was discussed in 202 of FIG. 2A. Contact may be made with an anti-contagion source (302) via a network such as the Internet. The old version identifier may be provided, for example using a transport protocol such as TCP/IP, and a data encapsulation format such as XML, or using a higher level protocol and format such as SOAP. A decision may be made as to whether an update is needed (303). In some embodiments, this update decision may be made by a server, upon review of the old version identifier. In some embodiments, this update decision may be made by the user's computer. In some embodiments, the update decision may be made by incorporating preferences held on a user's computer, such as a pref-

CISCO SYSTEMS, INC. / Page 28 of 37

5

erence to always have the newest updates, or preferences to avoid updates that have been available for less than a threshold length of time (for example, 2 weeks), or preferences that accept an additional update when the source indicates urgency associated with the update. In some embodiments, the update decision may be made based on considerations such as the size of the potential update, for example by avoiding the overhead of small updates, and only performing an update when a threshold amount of change has taken place, or when a threshold length of time has elapsed since an actual update was made. An example of a threshold amount of change taking place is the addition of a prescribed number of viral signatures, such as 2 new signatures. An example of a threshold length of time is 3 weeks. If the update is not needed (**303**) then the process of contacting the source is complete (**304**) in this example. If an update is needed (**303**) then an update is acquired in this example via direct or indirect channels (**305**), for example as further described in conjunction with FIG. **4**A. After the update has been acquired (**305**), the contact may be complete (**306**).

Distributed update distribution is disclosed. In some embodiments, at least some users receive an update indirectly, e.g., from another user that received it previously, either directly from the original source or indirectly from a source that had itself earlier received it, again either directly or indirectly, and so on. FIGS. **3**B-**3**D illustrate distributed update distribution as implemented according to some embodiments. In the example shown in FIGS. **3**B-**3**D, it is assumed for expository purposes that each host that receives the update will serve as a redistribution node, each recipient has the ability to redistribute at the same rate as the original source, and there is continuous demand for the update from all sources. As shown in FIG. **3**B, at a time t1 a first direct recipient of the update D1 (**332**) downloads the update from the original source S (**330**). As shown in FIG. 3C, at a time t2 a second direct recipient D2 (**334**) downloads the update from the original source and an indirect recipient R11 (**336**) downloads the update from the first direct recipient D1 (**332**), which in this case acts as a redistribution node. As shown in FIG. **3**D, at a time t3 a third direct recipient D3 (**338**) downloads the update from original source S (**330**), a second indirect recipient R12 (**340**) downloads the update from the first direct recipient D1 (**332**), a third indirect recipient R21 (**342**) downloads the update from the second direct recipient D2, and a fourth indirect recipient R111 (**344**) downloads the update from first indirect recipient R11 (**336**). In this example, in the three download cycles shown in FIGS. **3**B-**3**D on its own the original source would only have been able to download the update to the three direct recipients, but by using previous recipients to redistribute, in the example shown in FIGS. **3**B-**3**D a total of seven recipients have been able to obtain the update. In a generalized case, under the assumptions used in this example in "n" download cycles/ periods a total of 2n−1 recipients are able to obtain the update, whereas only "n" recipients, i.e., one per cycle, would otherwise have been able to obtain the update if it were only available directly from the original source. In an even more generalized case, under an assumption that each server may download roughly k copies in a time interval, for example where more than one download is provided by a server at a time, then in "n" download cycles (or periods) a total of roughly (k+1)n−1 recipients are able to obtain the update, where as only k*n recipients, i.e., k per cycle, would otherwise have been able to obtain the update if it were only available directly from the original source.

FIG. **4**A is a flow diagram of a method for acquiring an update according to some embodiments. In this example, an

6

update source is contacted (**401**), such as via an Internet connection, for example via TCP/IP. An offer to serve as a redistribution source is made (**402**). In some embodiments, a redistribution source may be contacted by other computers to acquire an update. An example of an offer to be a redistribution server is described in conjunction with FIG. **6**. In various embodiments, **402** is optional, performed only if a criterion or test is satisfied, or omitted. An update or an update identifier is acquired (**403**). An example of an update identifier is a version number for an update. Another example of an update identifier is a checksum for an update. Another example of an update identifier is a set of checksums (such as MD5, SHA-1, or CRC-32) for a corresponding set of byte ranges that form the update. Another example of an update identifier is a combination two or more identifiers, such as the identifiers enumerated above. If the update was completed (**404**) then the user confirms redistribution sourcing status (**408**) in this example. In some embodiments, confirmation includes asserting that the client is prepared to redistribute copies of the received data to one or more recipients. If the update was not completed (**404**), then a list of peer or other sources is acquired (**405**) in this example. In some embodiments, the list is or may be explicit. In some embodiments, the list is or may be implicit, for example represented by an iterator or accessor, which may retrieve elements on an as needed basis. In some embodiments, implicit lists are dynamic, and calculated or created in part on an as needed or as requested basis. In some embodiments, the list of other sources contain addresses that may be contacted to acquire an update, such as a list of IP addresses and ports, as well as optionally some authentication information to be used when contacting a listed source. In some embodiments, a requesting host that agrees to serve as a redistribution source is provided with a list of sources from which the update is available immediately, or at least sooner than it will be made available to hosts that will not redistribute. One or more attempts may be made to acquire the update from a listed source (**406**), for example as exemplified in FIG. **8**. If the update is completed via a listed source (**407**), then redistribution status is confirmed (**408**) in this example. If the update is not complete (**407**) then a reservation is optionally negotiated and/or acquired (**409**) in this example. In some embodiments, a reservation may include a time and/or a specific source or IP address. In some embodiments, a reservation address may be selected from a collection of source addresses, for example in order to distribute the load across more than one server, or to provide a server that is closer to a recipient. An example of selecting a server close to a recipient is to select a server having relatively lower latency during a download, or relatively lower cost, for example by selecting a source within a recipient's ISP complex or within a recipient's intranet or home network. If a reservation time was acquired, then a wait for that reservation time (**410**) is performed in this example. At the reservation time, a further attempt to acquire an update, or update identifier from the source (**403**) is made, and the flow proceeds as described earlier. This flow may continue until an acquisition is complete (**408**), as also described earlier. In various embodiments, one or more of confirming redistribution sourcing status (**408**), attempting to obtain the update from a redistribution source (**405**-**407**), and/or acquiring and/or waiting for a reservation time (**409**-**410**) is/are optional, conditional, or omitted.

FIG. **4**B is a block diagram of a client system configured to obtain an update according to some embodiments. In some embodiments, the client system shown in FIG. **4**B is used to implement one or more of clients **220**-**224** of FIG. **2**B. The client system **420** includes a communication interface **422**,

7

such as a network interface card, configured to send/receive communications via a network, such as the Internet. The client system **420** further includes an update agent and/or browser **424**. In some embodiments, the update agent/browser **424** comprises browser software used to navigate the World Wide Web, e.g., to send/receive data to/from a website from which an update is available for download. In some embodiments, update agent/browser **424** includes an agent associated with anti-contagion software installed on the client system **420**. In various embodiments, the update agent/browser **424** comprises one or more components and is implemented as one or more software programs running on a processor and/or one or more hardware components. A settings data store **426** stores one or more settings and/or other data associated with the software with which an update and/or software to which the update does or may pertain, such as periodicity or next scheduled (e.g., reservation) time to check for updates, a list of update identifiers, locators, and/or redistribution sources from which an update is or may be available, policies for which and/or under what terms, conditions, circumstances, etc. the client system **420** may be used redistribute an update, a last update time, an old version identifier (see, e.g., **202** of FIG. 2A), etc.

FIG. 4C is a block diagram of a system used to distribute an update according to some embodiments. In some embodiments, the system of FIG. 4C is used to provide an update server, such as update server **228** of FIG. 2B. In this example, the distribution system **440** includes a communication interface **442** configured to send/receive data via a network, such as the Internet. An update distribution engine **444** is configured to receive and service requests for updates. For updates provided directly to a request source, the update distribution engine **444** obtains the update from an update storage location **446** and provides the update to the request source via the communication interface **442**. In some embodiments, if data included in the request indicates the source of the request is or may be willing to serve as a redistribution source, the update distribution engine **444** hands the request off to a redistribution coordinator **448**, which negotiates with the request source, e.g., based on policies, settings, rules, etc. stored in a policies and lists data store **450**, through communications sent/received via communication interface **442**, to determine if the requesting source will serve as a redistribution source and, if so, to determine the terms and conditions of such service and data, such as an address, locator, or identifier, that can be provided to other requesting systems and/or users to enable them to attempt to obtain the update from the redistribution source. In some embodiments, if update distribution engine **444** determines that it is not able to provide the update to the request source directly (e.g., due to capacity limits or because a policy applicable to the request and/or the request source indicates the request source should be directed to a redistribution source, e.g., because the request source has a less expensive version of the software or is not willing to serve as a redistribution source), the update distribution engine **444** hands the request off to redistribution coordinator **448**, which provides to the request source an update identifier and a list of one or more redistribution sources from which the update is or may be available to the request source.

FIG. **5** is a flow diagram of a method for distributing updates according to some embodiments. In this example, a source prepares to supply updates to recipients (**501**), for example by starting up a server, for example an HTTP or FTP server, or a multicast server, such as an RTP multicast server. The server waits for an event (**502**), such as a contact or a predefined port, or a notification that the server should start a multicast. If a multicast-time event appears (**503**) then an

8

update is multicast (**504**) in this example. In some embodiments, a multicast time event may be generated internally or externally to the server to start a multicast. In some embodiments, a multicast-time event may be automatically generated at predetermined times, such as hourly, weekly, or daily, or on individually specified dates and times. In some embodiments, a multicast-time event may include a specific identifier for the multicast. If an event of the form of an update request arrives (**503**) then a test for authenticity is optionally performed (**505**) in this example. An example of determining whether a request is authentic is to check a credential. Examples of credentials include a provided shared secret, such as a secret used by all requestors to this server, or a different secret used by each requestor such as a user serial number, or a cryptographically signed authentication, such as credentials or a certificate issued to users that had paid for an update service, for example, by inclusion in a purchased software package. In some embodiments, all requests are assumed to be authentic without the use of any authenticator. If the request was not authentic (**505**) then, in this example, the server continues to wait for an event (**502**). If the request was authentic (**505**) then the server may determine a necessary update (**506**) in this example. In some embodiments, determination of an update may be made based on the requestor's state, which in some embodiments may be indicated in a received request for update. A redistribution contract may be negotiated (**507**). In some embodiments, some requestors may agree to redistribute updates to other requestors. In some embodiments, some requestors may decline to redistribute updates. In some embodiments, a source may decline redistribution proposals from a requestor. An example of a redistribution contract is an agreement not to redistribute. Another example of a redistribution contract is an agreement to redistribute a fixed number of copies, such as five copies. Another example of a redistribution contract is an agreement to redistribute for a fixed period of time, such as one day. Another example of a redistribution contract is an agreement to redistribute within a specified geographic region within a fixed period of time. Another example of a redistribution contract is an agreement to redistribute indefinitely, for example until a replacement update is provided. A redistribution contract may be made with terms that are combinations of the above mentioned exemplary term limitations. An update may be provided directly or indirectly (**508**). A direct update may for example be provided by allowing an FTP download, or by encapsulating the transmission in an HTTP transfer, for example using XML and/or an appropriate coding, such as uuencode. An indirect update may be provided by directing the requestor to an alternate source, such as a redistribution server, or a server at a different address, or a server at a different time, such as a future time, or a combination of two or more such specifications. In some embodiments, a decision to provide direct vs. indirect updates may be based in part on the redistribution contract, for example a requestor that is willing to redistribute may be updated sooner or more directly. An example of a redistribution contract is a promise by a user to provide redistribution in exchange for purchase price concession, such as a reduced initial purchase price, or a quantity discount price. In some embodiments, a decision to provide direct vs. indirect updates may be based in part on previous agreements, such as prepayment for expedited service, such as may be included in a more expensive version of a product that utilizes the updates. The server may wait for an event (**502**). In some embodiments, events may be processed in parallel with previous events, or may be sequentially pro-

Ex.1001
CISCO SYSTEMS, INC. / Page 30 of 37

**9**

cessed, or some combination, for example up to a threshold number of events in parallel, such as a maximum of 32 events in parallel.

FIG. **6** is a flow diagram of a method for establishing a redistribution policy according to some embodiments. In this example, a computer may prepare to offer to be a redistribution source (**601**). In some embodiments, preparations may include retrieving preferences, such as the number of redistributions that may be done, or the duration of time that the computer is willing to act as a redistribution source. In some embodiments, preferences may be defaults, or may be configured by a user and stored persistently, such as in a registry or file system. A contact address may be proposed to the source and a policy may be negotiated (**602**). A contact address may for example be a globally routable IP address and a port, or a local IP address (reachable from a LAN behind a firewall) and port that can be accessed by other computers on the LAN, such as computers that shared a common NAT address in their contact with the original source. In some embodiments, negotiation may include proposing a policy. In some embodiments, negotiations may involve a counter proposal in response to a proposal. An example of a counter proposal criterion is to require a minimum duration for redistribution. If terms were not acceptable (**603**) then, in this example, the computer does nothing (**604**). If the terms were acceptable (**603**) then, in this example, the computer prepares to service redistribution requests (**605**), for example by establishing a server to respond at the agreed contact address, reserving storage to hold the content for redistribution, etc. In some embodiments, redistribution policy may be a broader contractual matter, where an update is provided more quickly or more directly in exchange for a promise to redistribute. In some embodiments, an auditing mechanism may be used to measure compliance and penalize contract breakers, such as failure to accept connections for redistribution, where penalties may for example include refusal to accept future similar contracts. As another example, a lower purchase or subscription price may be offered for operators of a software product, such as antivirus software, who agree to act as redistribution points. In some embodiments such purchase agreements may be configured into the software, for example by establishing agreements to act as a redistribution point for updates as defaults that a user cannot modify.

FIG. **7** is a flow diagram of a method for redistributing content such as updates according to some embodiments. In this example, a redistribution computer is contacted and confirms its sourcing status (**701**), for example by accepting a TCP/IP connection on a predefined port, and processing a request for content. The redistribution computer may optionally contact another computer, for example a more original source, and affirm its redistribution sourcing status (**702**). A more original source may be a source that has provided content in the past to the redistribution computer, directly or indirectly. In some embodiments, contacting a more original source demonstrates that the redistribution computer is performing redistribution. In some embodiments, contacting a more original source allows the redistribution computer to further authenticate the computer that requested the content, for example by getting confirmation from a more original source that a specific computer was authorized to request the content. An authentication to be used to authenticate requests is negotiated (**703**). In some embodiments, authentication includes providing a shared secret to the redistribution computer. In some embodiments, authentication includes presenting an authorization cryptographically signed by a more original source, such as a certificate. In some embodiments, all requests are presumed authentic. If the request is not

**10**

authentic (**704**), then nothing further is done (**705**) in this example. If the request is authentic (**704**), then the requested update is supplied (**706**) in this example. The updates may be supplied for example via a transport protocol TCP/IP, or a higher level protocol such as FTP, HTTP, or HTTPS, etc.

FIG. **8** is a flow diagram of a method for using peers or other indirect data sources to acquire content such as updates according to some embodiments. In this example, a list of one or more peers or other indirect sources for acquiring updates is obtained (**801**), for example as was discussed in conjunction with **405** of FIG. **4**A. In one example, an indirect source may be a peer, such as another computer that has downloaded the content. In another example, an indirect source may be a computer configured to redistribute content without other use of the content, such as an ISP server established to redistribute content to subscribers. In another example, an indirect source may be a server created or authorized by the original source to perform additional distributions. In some embodiments, an obtained list of indirect sources may be implicit, for example by referring to a list using an iterator or accessor construct that can itemize entries in the list when requested, for example using a query to a service when an additional item in the list is required, which may for example dynamically complete the list on an as requested basis. A next address and (optional) authenticator in the list of sources is retrieved (**802**). Any order may be used. In some embodiments, an order of processing may correspond to the original list order. In some embodiments, an order of processing may be such that the earlier processed addresses would be expected to have lower latency and/or higher bandwidth, for example by first processing a local address on a LAN. In some embodiments, elements of the list are or may be processed in parallel, and portions (such as byte ranges) of the content may be acquired from different addresses in the list. An address on the list may be contacted to request content (**803**), which may in some embodiments be performed as described in conjunction with FIG. **7**. In one example, a source address may consist of an identifier for a broadcast with optional time(s) for a broadcast, and contact with the source may include receiving the broadcast. In another example, contact with the source may include making a connection such as a TCP/IP connection with the source. If the acquisition is complete (**804**), then the processing is complete (**805**) in this example. If the acquisition was not completed (**804**) then additional sources in the list are considered in this example. If there are more sources in the list (**806**) then, in this example, a next source is retrieved along with an optional authenticator (**802**) and the processing continues. If there are no more sources (**806**) then the attempted acquisition from source(s) is unsuccessful (**807**) in this example.

FIG. **9** is a flow diagram of a method for redistributing content such as updates according to some embodiments. In this example, a computer prepares to supply content (or updates) to a requestor/recipient (**901**), for example by starting up one or more servers. Examples of a server include an HTTP server, an FTP server, and a multicast server. A server waits for an event (**902**), such as a contact on a predefined port, or a notification that the server should be terminated, or a notification that a time for a multicast has arrived. If a service expiration event appears (**904**) then the supply service is terminated (**905**) in this example. A service expiration event may be automatically generated, for example after a predetermined duration of service, or after a predetermined number of copies of an update have been redistributed. If a request event arrives (**904**), then a test for authenticity is performed (**906**) in this example. Authenticity may be established in the request, for example by receiving and validating, or perform-

11

ing a mutual proof of possession of, a shared secret, such as a secret used by all requestors to this server, or a different secret used by each requestor of this service and held in a list of single-use secrets by this server, or by providing a cryptographically signed authentication. In some embodiments, all requests are considered authentic without the use of any authenticator. If the request was not authentic (**906**) then, in this example, the server continues to wait for an event (**902**) as described earlier. If the request was authentic (**906**) then, in this example, the server transmits a copy of the content to the requestor (**907**), for example by allowing an FTP download, or by encapsulating the transmission in an HTTP transfer, for example using XML and/or an appropriate coding, such as uuencode.

FIG. **10**A is a flow diagram of a method for identifying and remedying problems according to some embodiments. A problem may be identified as some event or status that may cause direct or potential harm. Exemplary problems include vulnerability or infestation. In this example, a problem such as a vulnerability or infestation is detected (**1001**). Infestation herein refers to the current presence and/or execution of contagion. In some embodiments, detection may be made by a router, firewall, or other network component, separately or in concert, using techniques such as those illustrated by FIGS. **11**, **12**, and **13**. In some embodiments, detection may be made by a computing device, for example a computing device operated by an ISP. After a detection of a problem, a computer or network containing the problem is quarantined (**1002**). In some embodiments, quarantining includes preventing unauthorized communications from being sent from the quarantined computer, such as efforts to infect, probe, or harass other computers, or efforts to communicate data without authorization, including for example file contents and keyboard entry logs. In some embodiments, no communications are authorized. In some embodiments, quarantining includes preventing undesired communications from reaching the quarantined computer, such as control messages or infectious messages. Examples of quarantining activities are illustrated in FIGS. **14** and **15**. In this example, the quarantined computer is provided access to remediation services (**1003**). In some embodiments, access to remediation includes or may include allowing connections to servers providing security patches or advisories, or example allowing connections to a vendor's server, or providing virus and worm disinfecting tools, such as focused removal tools, or data updates for previously installed repair tools. In some embodiments, access to remediation includes allowing direct access to vendor sites known to provide remediation assistance, such as to Microsoft's Windows Update service, where security patches may be obtained. In some embodiments, access to vendor sites is restricted by the quarantine to certain classes of traffic, such as HTTP requests, certain port access, such as port **80** or port **443**, certain content requests, such as specific URLs or specific file downloads. In some embodiments, remediation content may be substituted for other requested content, for example as discussed in conjunction with FIG. **14**.

FIG. **10**B is a block diagram illustrating a network environment in which infected hosts and/or networks are quarantined according to some embodiments. A plurality of hosts **1** to "m", represented in FIG. **10**B by hosts **1020**, **1022**, and **1024**, connect via a router **1026** and a gateway **1028** to the Internet **1030**. In various embodiments the router **1026** is omitted or included in the gateway **1028**. In various embodiments, gateway **1028** comprises a gateway, router, firewall, or other device configured to provide and control access between a protected network and the Internet and/or another public or private network. In various embodiments, the pro-

12

cess of FIG. **10**A is implemented, in the event of quarantine of one or more of hosts **1020**-**1024**, for example, on the affected (quarantined) host, router **1026**, and/or gateway **1028**. In some embodiments, a quarantined host (or a host associated with a quarantined network or sub-network) is permitted to access a remediation server **1032**, e.g., to download a patch, more current threat definition, etc. In some embodiments, requests to connection to a host other than the remediation server **1032** are redirected to a quarantine server **1034** configured to provide a notice and/or other information and/or instructions to a user of the quarantined host. In various alternative embodiments the quarantine server **1034** is omitted or resides on the router **1026** and/or gateway **1028**.

FIG. **11** is a flow diagram of a method for identifying vulnerabilities according to some embodiments. In this example, preparation is made to scan for one or more vulnerabilities (**1101**), for example by retrieving one or more IP addresses of computers that need to be scanned. For example, an IP address may be provided by a DHCP sever hosted in an ISP network complex, to identify current subscriber IP addresses. As another example, a subnet range may be scanned, for example by taking an address of the form A.B.C.X, and using some or all values of X in the range 0 to 255 to enumerate distinct IP addresses. A scan of one or more IP addresses may optionally be performed to detect an open port (**1102**). An example of scanning an IP address is scanning to detect open TCP/IP ports (**1102**). An open port may be identified by attempting to form a connection, such as a TCP/IP connection to that port. In some embodiments, only open ports on a given computer will provide acknowledgment messages needed to establish a TCP/IP connections, which for example causes a success code to be returned by Unix "connect( )" and a closed port will provide no response to the attempt to connect, which for example would cause an error code to be returned by the Unix function call "connect( )". If no open ports are detected (**1103**), then the scanning is complete (**1106**) in this example. If open ports are detected (**1103**) then those ports are tested for vulnerabilities (**1104**) in this example. In some embodiments, an open port is assumed (**1103**) and a test for vulnerability is performed or attempted (**1104**), for example by communicating a vulnerability test without independently testing to see if one or more requisite ports are open. In some embodiments, a vulnerability test of a port may include sending data that is known to create a discernable response when a vulnerability is present, such as sending a long string known to induce a buffer overflow with a consequent errant response, where the errant response may for example include a characteristic communication, premature termination of the connection, or other erroneous response(s). In some embodiments, a test for a vulnerability is an attempt to exercise a service, such as a sendmail or an RPC service, in search of a misconfiguration of that service that creates a vulnerability. One example of a misconfiguration of a service is provision of any such service. Another example of a misconfigured service is one where a password should be required for security purposes, but no password is required by the misconfiguration. Another example of a misconfiguration is the use of an easily guessable password, such as the default installation password, when resulting access creates a security vulnerability. Another example of a misconfigured service is support for a service provided by an unauthorized agent, such as a worm or virus. If no vulnerabilities are detected (**1105**) then scanning is complete (**1106**) in this example. If vulnerabilities are detected (**1105**) then an associated IP address is flagged as vulnerable (**1107**) in this example. In the case of a subscriber to an ISP, an IP address may be translated to a particular subscriber identity, for

Ex.1001
CISCO SYSTEMS, INC. / Page 32 of 37

13

example by checking in DHCP or static IP allocation tables for the subscriber's identity, or for example by extracting a MAC address from traffic associated with the IP address, and such identity may be appropriately flagged or recorded. In some embodiments, the record of the vulnerability may additionally include the port, and the details of the vulnerability that was detected, such as which buffer overrun was vulnerable, or which service was misconfigured to create a vulnerability.

FIG. **12** is a flow diagram of a method for identifying an infestation according to some embodiments. In this example, a device near a computer, such as a firewall on a LAN or an ISP's router, is used in some embodiments to monitor a computer for infestation (**1201**). Network traffic is monitored for anomalous traffic volume, port, or IP destination (**1202**), for example by detecting large volumes of outbound traffic, such as email traffic or instant messaging traffic. Another example of anomalous traffic is a TCP/IP connection to a server that is known to control a collection of infested machines, in a way that suggests the connecting machine is controlled by the server, such as connecting and transmitting an assertion that it is controlled or available to comply. Another example of anomalous traffic is a connection to a computer that is a current target of a denial of service attack, with a pattern that is consistent with the attack, such as a connection to a targeted port, or the use of a falsified return IP address. In some embodiments, a falsified return address may be detected by a router, such as an ISP router, that is aware that the return address is not on the sourcing subnet, or not associated with the MAC address that has supplied the corresponding packets. If an anomaly is detected (**1203**) then an apparent infestation is noted (**1204**) in this example. In some embodiments, a response to infestation may include quarantining of the computer or network containing the computer, for example as discussed in conjunction with FIGS. **14**, **15**, and **16**. In some embodiments, a response to infestation may include an attempt to remediate the problem, for example by inoculation, such as discussed in conjunction with FIG. **17**. If no anomaly is detected (**1203**) then monitoring is complete (**1205**) in this example. In some embodiments, monitoring for anomalous traffic may be continuous. In some embodiments, monitoring for anomalous traffic may be periodic. For example, periodic monitoring may consist of monitoring some number of computers, such as 1 computer, for some period of time, such as 2 minutes, and then not monitoring those computers again for another period of time, such as 1 hour. As another example, periodic monitoring may be randomized, for example by changing the duration of monitoring, pattern of selecting computers to monitor, and/or the unmonitored duration, to be difficult or impossible to predict, for example by being driven by a pseudo random number generator, subject to restrictions of available monitoring computers.

FIG. **13** is a flow diagram of a method for monitoring one or more computers for infestation according to some embodiments. In this example monitoring of a computer for infestation begins (**1301**), for example by retrieving a list of one or more addresses of computers, such as addresses of participating subscribers. In some embodiments, this list may be a list of addresses for some or all subscribers for a given ISP. In some embodiments, the list may be a list of IP addresses issued by a DHCP server, such as on a LAN, or a list of IP addresses observed by a router, such as a router on a LAN, or a complete list of IP addresses in a given subnet. A computer associated with an address identified in a list is queried for a cleanliness assertion (**1302**), for example by contacting a trusted computing base within a computer, and requesting an

14

authenticated infestation scan by trusted software. An example of a trusted computing base within a computer is the Paladium security initiative under development by Microsoft and supported by Intel and American Micro Devices. Another example of a trusted computing base is described in various TCG specifications, such as the TCG Architecture Overview, published by the Trusted Computing Group. Trusted code bases may for example execute antivirus scans of the remainder of the computer, including untrusted portions of the disk and/or operating system. In some embodiments, trusted code bases may digitally sign assertions about the cleanliness (e.g. infestation status) and/or state of their computers. In some embodiments, the query for cleanliness (**1302**) may be responded to by anti-contagion software, such as antivirus software, with assertions about the currency of a scan, such as the last time a scan was performed, or a version associated with a current anti-contagion software or definition file in use, wherein a sufficiently updated software and/or scan may act as a cleanliness assertion. In some embodiments, an operating system may respond with information associated with its patch level, wherein a sufficiently recent patch level may be interpreted as an assertion of cleanliness. If a computer asserts it is clean (**1303**) then monitoring is complete (**1305**) in this example. If a cleanliness assertion is not provided (**1303**) then an infestation or vulnerability is presumed (**1304**) in this example.

FIG. **14** is a flow diagram of a method for quarantining a computer according to some embodiments. In this example, a decision has been made to quarantine a computer (**1401**), such as an ISP deciding to quarantine a subscriber, or a firewall or router for a LAN deciding to quarantine a local computer. In some embodiments, a decision to quarantine may be made based on apparent infestations or apparent vulnerabilities, for example as illustrated in conjunction with FIG. **11**, **12**, or **13**. In some embodiments a decision to quarantine may be based on the accumulation of evidence above a threshold, such as a threshold of one such piece of evidence, or a threshold of two such pieces of evidence. In some embodiments, a decision to quarantine may be made based on configuration rules, for example all new computers must be quarantined until they have contacted their OS vendor and been updated, or by user specification, such as a user requesting a quarantine for a specific computer. In some embodiments, requests for a quarantine may be made on an individual computer via settings, such as control panel in Microsoft Windows, or through a user interface to a firewall or router, for example by specifying an IP address, name, or MAC address to quarantine, or a list of addresses that are not to be quarantined (where other addresses may be quarantined). During a quarantine period outbound traffic is detected (**1402**), for example by a device such as a router, or by a software network stack on the quarantined computer, or by an upstream device, such as a device at an ISP. Outbound traffic is tested in this example to see if it is associated with a remediation request (**1403**), such as contact with an appropriate anti-contagion software distributor, or contact with a security patch update provider, such as Microsoft Windows Update, or contact with a verified remediation site, such as an internal ISP site. If outbound traffic is deemed to be associated with a remediation request (**1403**), then the traffic is routed or forwarded to its destination (**1404**) in this example. If outbound traffic is not associated with a remediation request (**1403**), then, in this example, it is tested to see if it is an approved service request (**1405**), such as a request for a web page. If the request was for an approved service (**1405**) then, in this example, the request is re-routed to a special quarantine server (**1407**), such as an ISP web server that

15

provides information and links to assist in remediation. Re-routing of request traffic may be accomplished in numerous ways, for example by providing an alternate DNS service that consistently returns a fixed IP address of a quarantine server in response to all DNS requests. Another example of re-routing a web page request is to respond with a redirect message, which would direct a browser on a quarantined computer to contact a quarantine server that provides reme-diation information. If the request was not for an approved service (**1406**), then the outbound traffic is discarded or responded to with in indication that the desired traffic desti-nation is unreachable (**1406**) in this example.

FIG. **15** is a flow diagram of a method for quarantining a computer according to some embodiments. In this example, a decision has been made to quarantine a computer (**1501**), for example as described in conjunction with **1401** of FIG. **14**. Inbound traffic originally destined for a quarantined com-puter is detected (**1502**), for example by a network device such as a router. An example of detecting inbound traffic destined for a quarantined computer is to have a list of quar-antined IP addresses, and filter or provide additional process-ing on traffic destined for an address on the list. Detected inbound traffic is tested in this example to see if it is reme-diation related (**1503**), such as a response to a remediation request. Direct responses to remediation requests may for example be identified using stateful packet inspection firewall techniques known to those skilled in the art. In various embodiments, at least certain types of traffic from approved sites such as anti-contagion vendors, security update provid-ers, and/or internal ISP sites are deemed remediation related. If traffic is remediation related (**1503**) then it is forwarded to the quarantined computer (**1504**) in this example. If traffic is not remediation related (**1503**) then, in this example, it is discarded or responded to with a message indicating that the destination is unreachable (**1507**).

In some embodiments, a configuration based quarantine during an installation of an operating system, such as Microsoft Windows, may be automatically setup, for example by a default installation setting up restrictions in a firewall installed with the OS or by an installation setting defaults for use when network connectivity is enabled, that establishes a quarantine, for example restricting internet connections, for example allowing internet connections only to a security update site such as Microsoft Windows Update. In some embodiments, settings that may establish a quarantine, such as default settings in an operating system installation, may be altered programmatically to remove the quarantine in response to a remediation site, such as a security update service such as Microsoft Windows Update, asserting that there are no other security updates pending. In some embodi-ments, configuration settings that may establish a quarantine may be altered programmatically to enable a quarantine in response to the presence of one or more security updates, such as provided by an operating system update service such as Microsoft Windows Update, that are available for installation on a computer.

FIG. **16** is a flow diagram of a method for a quarantine server to respond to requests according to some embodi-ments. In this example, a quarantine server is started (**1601**), for example by starting a web server, or DNS server, or proxy server, or ftp server, or some combination server. The server waits for a request (**1602**), for example by listening on a port and waiting for a connection. In some embodiments, a device such as a router may forward outbound traffic from a quaran-tined computer to a quarantine server, for example as illus-trated in conjunction with **1407** of FIG. **14**. If a received connection is a web server request (**1603**), such as an HTTP

16

request, then the server responds with a quarantine notifica-tion page (**1604**) in this example. An example of a quarantine notification page is a web page that provides notification that the computer is quarantined, and/or provides links to reme-diation sites appropriate to the quarantine, such as a link to a site that provides anti-contagion software for removing a virus that the quarantined computer is believed to contain. The links on the quarantine notification page may be examples of HTTP addresses that are for use in remediation. Another example of a quarantine notification page is a page that redirects to a quarantine notification page. If the request is not a web server request (**1603**), then it is tested to see if it is a DNS inquiry (**1605**) in this example. A DNS inquiry may for example appear on port **53** using TCP/IP or UDP. If the request is not a DNS inquiry (**1605**) then it may be discarded or responded to as "unreachable" (**1606**) in this example. If the request is a DNS inquiry (**1605**) then, in this example, the inquiry is tested to see if it is a DNS request for a remediation host name (**1608**). A remediation host name may include a host name as appropriate to the reason for a quarantine, such as a host providing anti-contagion software, or a host provid-ing security updates, or a host internal to (or partnered with) an ISP. If the DNS inquiry was for a remediation host name (**1608**) then the request is proxied to an external DNS service provider (**1609**) in this example. A proxy to a DNS service (**1609**) may return a stored or cached response, such as the actual IP address of the host name, or it may contact an external DNS service to relay back the proposed IP address. If the DNS inquiry was not for a remediation host name (**1608**) then an IP address for a quarantine server is provided (**1607**) in this example. In some embodiments, when a redirected IP address is provided, such as that of a quarantine server, the DNS response may include a short time to live, for example 0 seconds. A short time to live ensures that a further DNS query will be sent prior to subsequent communications being sent from the quarantined computer to the host that was the subject of the DNS query, aiding a return to normal routing of traffic once the computer is no longer under quarantine. In some embodiments, the server(s) in this example may continue to wait for a service request (**1602**) in parallel with the process-ing of the requests as described above, or may wait for a service request again after disposition of the previous request as described above.

FIG. **17** is a flow diagram of a method for scanning back-doors and inoculating according to some embodiments. In this example, preparations are made for scanning a computer for a backdoor inoculation path (**1701**), for example by iden-tifying the computer to be scanned, and enumerating or retrieving a list of one or more backdoors. In one example, an IP address to be scanned may be selected by an ISP from a list of subscribers. In one example, a list of backdoors may include information associated with preloaded software approved by the computer owner for access and inoculation purposes, such as an ISP provided utility that is installed by the subscriber. In some embodiments, an ISP defined back-door may have an authentication protocol to preclude contact by unauthorized parties, such as restrictions on IP address(es) that may contact the backdoor, or shared secrets such as a password required by the sender, or cryptographic authenti-cation such as client authentication on an SSL connection. In some embodiments, a user is requested and/or required to authorize in advance use of an authorized and/or any unau-thorized backdoor for purposes of inoculation. As another example, a list of backdoors may include virus or worm installed backdoors, such as those installed by a SubSeven virus or Back Orifice. As another example, backdoors may include exploitable security vulnerabilities, such as a weak-

17

ness in a web server, or a weakness in an RPC service. A scan may optionally be conducted to detect open TCP/IP backdoor ports (**1702**) similarly to the scan discussed in conjunction with FIG. **11**. If none of the backdoors are open (**1703**), for example there is no response on any of the ports, then the scan is complete (**1706**) in this example. If one or more backdoor ports are open (**1703**) then they are tested for usability (**1704**) in this example. In some embodiments, a backdoor port may be assumed open (**1703**) and may be tested for usability (**1704**) without an independent test to see if the port is open. An example of a usability test is no test at all, with the conclusion that a specific port is usable any time it is open. Another example of a usability test is based on the receipt of confirmation of a functional installation of ISP provided backdoor software, such as a confirmation that may be provided by the installed software. Another example of a usability test involves the use of a less invasive test of vulnerabilities such a buffer overrun exploit that does not have a permanent impact but provides observable validation (such as a dropped connection). If a backdoor is usable (**1705**) then the computer is inoculated via a backdoor (**1707**) in this example. One example of such an inoculation is the remotely controlled download of one or more remedy files into one or more directories, such as an operating system directory, such as the "\windows\system" directory in Microsoft Windows 2000. Another example of an inoculation is the download of an executable file to the computer, followed by the execution of that file. Another example of an inoculation is the download of a data file, such as an anti-contagion signature file, that is interpreted or processed by another executable already on the computer. Another example of an inoculation is the deletion of one or more files from the computer. Another example of an inoculation is the editing of one or more registry entries, or of one or more files, such as deleting, appending or rewriting entries in a registry or file. Another example of inoculation includes a combination of one or more of above techniques, optionally in conjunction with one or more remotely instigated reboot operations. Another example of inoculation includes a combination of one or more of the above techniques, along with an optional dialog box requesting a user's permission to proceed with the inoculation. Another example of inoculation is the use of a dialog box in conjunction with a timer that causes the inoculation to proceed if no user response is given in a prescribed period of time, such as 1 hour.

FIG. **18** is a flow diagram of a method for categorizing messages according to some embodiments. In this example, a message is received (**1801**), such as an email message or instant message. The purported sender's identity is extracted (**1802**), for example by examining the "From:" header line in an email message, or by examining the envelope information conveying an email message, or by examining the sender's ID in an instant message. A check is performed to see if the sender has sent any prior messages (**1803**), for example by scanning an inbox of prior email, or by checking for the sender in a buddy list. If there were no prior messages from the sender (**1803**) then the message is processed (**1804**) in this example. Processing the message may for example include presenting the message to the user, and/or recording routing information for comparison and categorization of future messages. If there were prior messages from the sender (**1803**) then routing information used in prior messages is retrieved (**1805**) in this example. Routing information may for example be extracted from the header in email. Routing information may for example be obtained during an instant message session by retrieving the IP address of the party being communicated with, for example as is done when an instant message

18

session coordinates a peer-to-peer activity such as a direct file transfer with a remote party. In some embodiments, routing information may be stored implicitly, such as in headers of a previously received message, or explicitly, for example by extracting routing information and storing it in a database or file system. Routing information for the current message is compared to prior messages (**1806**), for example by checking that the IP address for the party being communicated with is in a similar subnet, or allocated within the same geographical region, for example the same continent, as a previous IP address for the same party. IP address to geographical location may be estimated by various software applications and services, such as services provided by MaxMind and described on http://www.maxmind.com. In some embodiments, routing information for an email message may be deduced by examining header information related to mail transfer agents. In some embodiments, similarity in IP addresses for mail transfer agents may be interpreted as implying similar routing. If routing is similar to previous messages from the same sender (**1806**), then the message is processed as legitimate (**1808**) in this example. If the routing information for a message purporting to be from a sender is not similar to previous messages from the same sender (**1806**) then the message is processed as suspicious (**1807**) in this example. In some embodiments, processing as suspicious may include contributing to a scoring that labels the message as an undesirable message, such as spam, viral, or phishing. In some embodiments, higher probability suspicious messages may be scrutinized further, or may be restricted to some extent in their impact on the computer. An example of restricting impact of a message may include discarding the message. Another example of restricting impact or further scrutiny of a message may include placing a message in a spam inbox. Another example of a restricting impact of a message may include preventing execution of content contained in the message, and/or requiring additional user interactions to bypass the restriction, for example by having a user agree to ignore warnings which describe the suspicious circumstances. In various embodiments, the process of FIG. **18** is implemented on a mail, messaging, or other server associated with the sender and/or the sender's ISP; a mail, messaging, or other server associated with the recipient and/or the recipient's ISP; and/or one or more intermediate nodes.

FIG. **19**A is a flow diagram of a method for notifying possible sources of infection according to some embodiments. In this example, an infected message is received (**1901**). An example of an infected message is a message classified as such by anti-contagion software. Routing information is extracted from the message (**1902**). An example of extracting routing information in an email message is to extract header lines inserted by mail transfer agents that propagated the message. Another example of extracting routing information is to acquire an IP address of a party making contact via instant messaging, for example as is provided by AOL's instant message infrastructure for a peer-to-peer file transfer. Routing information from previously received messages is retrieved (**1903**). An example of retrieving email routing information from prior messages is scanning all received messages, such as messages in an email inbox, and extracting routing information. Another example of retrieving routing information is to query a database or file system where routing information from previous messages has been gathered. Routing information for the infected message is compared with the retrieved routing information (**1904**). If no similarity with previous messages is found (**1904**) then in this example a third party notification is made (**1906**). An example of a third party notification is sending notification to the ISP

**19**

that provides network access to the message source. Another example of a notifying a third party is notifying a viral clearinghouse of the apparent source of a viral message. Another example of a notifying a third party is notifying a service that determines the credibility of a report, such as a collaborative filter service, that accumulates accusations of viral disseminations. In some embodiments, similarity of routing of an infected message with a previous message may include having a previous message from the IP address of the infected message source. If a similarity is found with previous messages (**1904**) then in this example a notification is sent (**1905**). In some embodiments, notification may be sent (**1905**) to one or more sources of the prior message(s) that best match the infected message, and/or to third parties. As an example, notification may be sent to an email source that had the same originating IP address as the infected message. In some embodiments, a user may be asked to approve notification(s), for example via a pop-up dialog. In some embodiments, notification may be automatically sent without user intervention.

FIG. **19**B is a block diagram illustrating a network environment in which suspicious messages are identified and/or one or more notifications are sent when a malicious message is detected. A message source **1920** sends a message via the Internet **1922** to a message processing system **1926** for delivery via the Internet to one or more message destinations **1924**. In various embodiments, the message processing system **1926** comprises a mail or messaging server associated with the message source **1920**, a mail or messaging server associated with the destination(s) **1924**, and/or an intermediate processing node. In some embodiments, the message source **1920** is connected directly and/or via a local network, and not via the Internet **1922** as shown in FIG. **19**B, to message processing system **1926**. In some embodiments, message processing system **1926** is configured to identify suspicious messages using current and historic routing information, e.g., as described above in connection with FIG. **18**. In some embodiments, the process of FIG. **19**A is implemented on message processing system **1926**. For example, in some embodiments if message processing system **1926** determines that a message sent by message source **1920** is infected, message processing system **1926** compares routing information associated with the malicious message with corresponding information for one or more messages received previously from the message source **1920**. If the routing information is similar, in some embodiments the message processing system **1926** notifies the message source **1920**. If the routing information is not similar, in various embodiments the message processing system **1926** notifies the message source **1920**, the sender's ISP **1928**, and/or a clearinghouse or similar applicable service **1930**, as described above.

Although the foregoing embodiments have been described in some detail for purposes of clarity of understanding, the invention is not limited to the details provided. There are many alternative ways of implementing the invention. The disclosed embodiments are illustrative and not restrictive.

What is claimed is:

**1**. A method for protecting a network, comprising:

detecting an insecure condition on a first host that has connected or is attempting to connect to a protected network, wherein detecting the insecure condition includes contacting a trusted computing base associated with a trusted platform module within the first host, receiving a response, and determining whether the response includes a valid digitally signed attestation of cleanliness, wherein the valid digitally signed attestation of cleanliness includes at least one of an attestation that the trusted computing base has ascertained that the

**20**

first host is not infested, and an attestation that the trusted computing base has ascertained the presence of a patch or a patch level associated with a software component on the first host;

when it is determined that the response does not include a valid digitally signed attestation of cleanliness, quarantining the first host, including by preventing the first host from sending data to one or more other hosts associated with the protected network, wherein preventing the first host from sending data to one or more other hosts associated with the protected network includes receiving a service request sent by the first host, serving a quarantine notification page to the first host when the service request comprises a web server request, and in the event the service request comprises a DNS query, providing in response an IP address of a quarantine server configured to serve the quarantine notification page if a host name that is the subject of the DNS query is not associated with a remediation host configured to provide data usable to remedy the insecure condition; and

permitting the first host to communicate with the remediation host.

**2**. A method as recited in claim **1**, wherein detecting an insecure condition further includes at least one of the following: scanning for a vulnerability, scanning for malicious data, determining whether a security software is installed, and detecting anomalous network traffic.

**3**. A method as recited in claim **1**, wherein detecting an insecure condition includes determining that the first host should be quarantined until an update to an operating system has been installed.

**4**. A method as recited in claim **1**, wherein detecting an insecure condition includes configuring an operating system to quarantine the first host upon initial startup after installation of the operating system.

**5**. A method as recited in claim **1**, wherein permitting the first host to communicate with the remediation host includes:

detecting an outbound communication from the first host; and

forwarding the outbound communication if it is addressed to the remediation host.

**6**. A method as recited in claim **1**, wherein preventing the first host from sending data to the one or more other hosts includes:

detecting an outbound communication from the first host; and

redirecting the outbound communication to a quarantine server if it comprises a request for an approved service and is not addressed to a remediation host.

**7**. A method as recited in claim **1**, wherein quarantining the first host further includes preventing the first host from receiving via the protected network data not related to remediation of the insecure condition.

**8**. A method as recited in claim **1**, performed at an Internet service provider.

**9**. A method as recited in claim **1**, wherein the software component on the first host is an operating system.

**10**. A method as recited in claim **1**, wherein determining that the response does not include a valid digitally signed attestation of cleanliness includes determining that the software component on the first host is not sufficiently updated.

**11**. A method as recited in claim **1**, wherein determining that the software component on the first host is not sufficiently updated includes determining that a patch level associated with the software component on the first host is not sufficiently recent.

Ex.1001
CISCO SYSTEMS, INC. / Page 36 of 37

**12**. A system for protecting a network, comprising:

a processor configured to:

> detect an insecure condition on a first host that has connected or is attempting to connect to a protected network, wherein detecting the insecure condition includes contacting a trusted computing base associated with a trusted platform module within the first host, receiving a response, and determining whether the response includes a valid digitally signed attestation of cleanliness, wherein the valid digitally signed attestation of cleanliness includes at least one of an attestation that the trusted computing base has ascertained that the first host is not infested, and an attestation that the trusted computing base has ascertained the presence of a patch or a patch level associated with a software component on the first host;
>
> when it is determined that the response does not include a valid digitally signed attestation of cleanliness, quarantine the first host, including by preventing the first host from sending data to one or more other hosts associated with the protected network, wherein preventing the first host from sending data to one or more other hosts associated with the protected network includes receiving a service request sent by the first host, serving a quarantine notification page to the first host when the service request comprises a web server request, and in the event the service request comprises a DNS query, providing in response an IP address of a quarantine server configured to serve the quarantine notification page if a host name that is the subject of the DNS query is not associated with a remediation host configured to provide data usable to remedy the insecure condition; and
>
> permit the first host to communicate with the remediation host; and

a memory coupled to the processor and configured to provide instructions to the processor.

**13**. A system as recited in claim **12**, wherein the processor is configured to detect an insecure condition at least in part by performing one or more of the following: scanning for a vulnerability, scanning for malicious data, determining whether a security software is installed, and detecting anomalous network traffic.

**14**. A system as recited in claim **12**, wherein the processor is configured to detect an insecure condition at least in part by determining that an initial startup after installation of an operating system is being performed.

**15**. A system as recited in claim **12**, wherein the processor is configured to quarantine the first host at least in part by

preventing the first host from receiving via the protected network data not related to remediation of the insecure condition.

**16**. A system as recited in claim **12**, wherein the software component on the first host is an operating system.

**17**. A system as recited in claim **12**, wherein determining that the response does not include a valid digitally signed attestation of cleanliness includes determining that the software component on the first host is not sufficiently updated.

**18**. A system as recited in claim **17**, wherein determining that the software component on the first host is not sufficiently updated includes determining that a patch level associated with the software component on the first host is not sufficiently recent.

**19**. A computer program product for protecting a network, the computer program product being embodied in a non-transitory computer readable medium and comprising computer instructions for:

> detecting an insecure condition on a first host that has connected or is attempting to connect to a protected network, wherein detecting the insecure condition includes contacting a trusted computing base associated with a trusted platform module within the first host, receiving a response, and determining whether the response includes a valid digitally signed attestation of cleanliness, wherein the valid digitally signed attestation of cleanliness includes at least one of an attestation that the trusted computing base has ascertained that the first host is not infested, and an attestation that the trusted computing base has ascertained the presence of a patch or a patch level associated with a software component on the first host;
>
> when it is determined that the response does not include a valid digitally signed attestation of cleanliness, quarantining the first host, including by preventing the first host from sending data to one or more other hosts associated with the protected network, wherein preventing the first host from sending data to one or more other hosts associated with the protected network includes receiving a service request sent by the first host, serving a quarantine notification page to the first host when the service request comprises a web server request, and in the event the service request comprises a DNS query, providing in response an IP address of a quarantine server configured to serve the quarantine notification page if a host name that is the subject of the DNS query is not associated with a remediation host configured to provide data usable to remedy the insecure condition; and
>
> permitting the first host to communicate with the remediation host.

\*   \*   \*   \*   \*

Ex.1001
CISCO SYSTEMS, INC. / Page 37 of 37